In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-2065

SALIK RAO,

*Plaintiff-Appellant*,

v.

BP PRODUCTS NORTH AMERICA, INC., et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6040—**Joan B. Gottschall**, *Judge.*

ARGUED APRIL 18, 2008—DECIDED DECEMBER 9, 2009

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* After BP Products North America, Inc. ("BP") determined that Salik Rao had secretly paid a BP manager to influence the award of operating agreements in Rao's favor, BP told Rao it was terminating its franchise relationship with him at his two BP gas stations. Rao maintains that BP failed to give him timely notice of early termination as required by the Petroleum Marketing Practices Act. We conclude that BP acquired knowledge of Rao's failure to comply

with a franchise provision when Rao stopped cooperating with BP's investigation, so the notice was timely. Rao had maintained all along that he had been the victim of extortion, and BP reasonably decided to continue investigating instead of immediately terminating the franchise. Summary judgment was also proper on Rao's breach of contract claim because the franchise agreement allowed for early termination upon the commission of any fraudulent act. We further affirm the dismissal of Rao's claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and for common-law fraud because the allegations in the complaint did not sufficiently state a claim on either count. As a result, we affirm the judgment of the district court.

## I. BACKGROUND

In accordance with a local rule, the district court justifiably deemed the factual assertions in BP's Rule 56.1(a) Statement in support of its motion for summary judgment admitted because Rao did not respond to the statement. *See* N.D. Ill. R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Cracco v. Vitran, Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). We recount the narrative that follows with that in mind.

Salik Rao began operating as a BP dealer in 1992. The twelve or so BP gas stations he has operated include the two relevant in this case: a station in Morton Grove, Illinois

and another in Franklin Park, Illinois. Rao began operating the Morton Grove station in 1997 and the Franklin Park station in 1999. Stephen Yarr was a BP regional sales manager until he was fired in November 2003. As the regional sales manager, Yarr had significant control over the award of franchises and dealerships in Chicago's northern and western suburbs.

From 1993 to 2003, Rao paid Yarr approximately $100,000 in cash and gifts, including a computer, big-screen television, and other electronics—all in an attempt to influence decisions regarding BP franchises. During that time, Yarr allowed Rao to purchase interests in two downtown Chicago stations at a good price, and Rao secretly gave Yarr an interest in the stations. One was sold about eighteen months after Rao purchased it for a profit of over $1 million.

In 1997, Rao purchased a BP station in Wilmette, Illinois. Although BP did not know it at the time, Rao and Paige Thomason, a BP area representative, each put up half the purchase price for the station. As a BP employee, however, Thomason was prohibited from owning an interest in any BP station. To get around this ban, Rao agreed to form a corporation for the acquisition that fronted Brad Schumacher, Thomason's husband, as its corporate officer. After Thomason stopped working for BP, Rao agreed to sell his interest in the Wilmette station to her. Concerned that BP might exercise its right of first refusal, Thomason and Rao submitted a false letter of intent to BP that represented the station's purchase price and value at $700,000 when it was actually worth only

$500,000. BP did not exercise its right of first refusal, and Thomason bought Rao's interest in the station for $250,000.

Rao also introduced his cousin, Ateeq Khan, to Yarr while Yarr was the BP regional sales manager. Rao arranged for Khan to meet Yarr in connection with a BP station in Lockport, Illinois. Khan admitted that he negotiated a payment of $10,000 to Yarr related to the sale of the Lockport station before the FBI became involved in an investigation into money and gifts given to Yarr.

Although Rao knew the money and gifts he was providing to Yarr were improper, he did not say anything to anyone at BP until the summer of 2003. That summer, Rao told Yarr's boss that he was having problems with Yarr. BP then had Rao meet with its regional security advisor, Ronald Benhart. During a meeting in August 2003, Rao told Benhart that he and other dealers had provided gifts and benefits to Yarr over a long period of time, and that he had been extorted by Yarr. In response to the allegation of extortion, Benhart began an internal investigation that had Yarr as its principal focus. Benhart asked Rao to provide any documentation or evidence he had to substantiate his allegations. Benhart also contacted the FBI in August 2003 and asked for its cooperation in the investigation. On November 7, 2003, with Rao's cooperation, the FBI conducted a sting in which Rao paid Yarr $10,000. That month, Benhart conducted multiple interviews with Yarr, and Yarr admitted that he had received money and gifts for facilitating transactions with dealers. BP fired Yarr on November 17, 2003.

The termination of Yarr's employment did not end BP's investigation. Benhart continued to investigate after November 2003, and he did so because Rao was still maintaining that Yarr had coerced him into providing benefits. On November 4, 2003, Rao gave Benhart a seventeen-page statement listing and explaining the gifts he gave to Yarr. The statement repeated his assertion that he had been the victim of Yarr's extortion. Therefore, Benhart continued to seek any evidence of extortion. To that end, he also continued to contact Rao in an attempt to set up meetings. Rao stated that he would meet with Benhart, although he did not do so after the fall of 2003. Benhart last spoke with Rao in May or June of 2004, and Rao's attorney told Benhart in June that Rao would no longer cooperate with BP's investigation.

After Benhart was told that Rao would not cooperate any further, Benhart informed BP management that no further information would be forthcoming from Rao. BP management then made the decision to end its relationship with Rao. On July 14, 2004, BP notified Rao via letter that effective October 15, 2004, it was ending its franchise relationship with him because it concluded that he had engaged in bribery and fraud. It sent similar letters to other dealers who had been involved in comparable activities with Yarr. At the time, Rao was operating two BP stations under franchise agreements, one in Morton Grove with an agreement that expired in 2005, and another in Franklin Park that expired in 2006. BP subsequently extended the effective date of its terminations until December 13, 2004, then to February 18, 2005, and then to May 2, 2005, to allow Rao more time to sell

his interests in the Morton Grove and Franklin Park stations.

Rao filed suit in federal court against BP, Yarr, Thomason, and Schumacher alleging Petroleum Marketing Practices Act ("PMPA"), RICO, fraud, breach of contract, and extortion claims. After Rao filed a motion for a preliminary injunction to enjoin BP from terminating his franchises, a magistrate judge conducted a four-day evidentiary hearing. The magistrate judge recommended denying Rao's motion because "Rao was actively engaged in bribery and fraud" and "BP acted in good faith and was justified in terminating Rao as a BP dealer." The district court agreed and denied the preliminary injunction motion. It later granted the defendants' motion to dismiss Rao's RICO, fraud, and breach of contract claims and granted the defendants' motion for summary judgment on the remaining claims. Rao appeals.

## II. ANALYSIS

### A. Notice Timely Under Petroleum Marketing Practices Act

Rao maintains that the notice BP gave that it was ending its relationship with him was not timely under the PMPA. We review the district court's grant of summary judgment on this issue de novo. *See Breneisen v. Motorola, Inc.*, 512 F.3d 972, 977 (7th Cir. 2008). Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Hobbs v. City of Chi.*, 573 F.3d 454, 460 (7th Cir. 2009).

The PMPA prohibits a franchisor from terminating a motor fuel franchise prior to the completion of its term unless the franchisor does so: (1) on the basis of a ground provided in the statute, and (2) with the notice the statute requires. 15 U.S.C. § 2802(a); *Jet, Inc. v. Shell Oil Co.*, 381 F.3d 627, 629 (7th Cir. 2004). In doing so, the statute protects gas station franchisees from the arbitrary termination or nonrenewal of their franchises by large corporations, as well as from the threat of termination or nonrenewal. *See Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d 33, 39 (1st Cir. 2008) (citing S. Rep. No. 95-731, at 17-19 (1978)); *DuFresne's Auto Service, Inc. v. Shell Oil Co.*, 992 F.2d 920, 925 (9th Cir. 1993). The PMPA provides a civil cause of action for motor fuel franchisees terminated or not renewed in violation of its provisions. 15 U.S.C. § 2805; *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 755 (7th Cir. 2008).

Although the PMPA generally prohibits the early termination of a franchise, there are exceptions. Two of the exceptions are particularly relevant here. The PMPA allows early termination when there has been a "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship . . . ." 15 U.S.C. § 2802(a)(2)(A). Another ground for early termination is "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable . . . ." 15 U.S.C. § 2802(a)(2)(C). The PMPA specifically lists "fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises" as an event falling within the latter provision. 15 U.S.C. § 2802(b)(2)(C).

On appeal, Rao does not contest that BP had the requisite cause to end its relationship with him. Engaging in fraud against BP related to franchise award and purchase was relevant to the franchise relationship, and termination on that account was reasonable. *See Humboldt Oil Co. v. Exxon Co., U.S.A.*, 695 F.2d 386, 389 (9th Cir. 1982) ("Good faith belief of the franchisor that the franchisee is untrustworthy or engages in fraudulent practices undermines the entire franchise relationship."). Rao paid Yarr six figures worth of cash and gifts to influence the award of gas stations to him, including the Morton Grove and Franklin Park stations at issue in this case. He made payments to Yarr that allowed him to get a good price for two downtown service stations, and he secretly made Yarr a partner in those stations. Rao also secretly made Thomason a partner in another station while she was a BP employee prohibited from having an interest in a BP station and used her husband as a straw owner. Rao then sold his interest in it to her after she stopped working for the company. Rao and Thomason even submitted a false letter of intent that inflated the purchase price in a successful attempt to deter BP from exercising its right of first refusal. BP certainly had grounds under the statute to end its relationship with Rao.

Rather than arguing that BP's basis for termination was insufficient, Rao's argument on appeal is that the notice he received was untimely under the PMPA. Pursuant to the PMPA provisions applicable here, a franchisor must give notice of early termination within 120 days of when it "first acquired actual or constructive knowledge" of the failure to comply with a material franchise

provision. 15 U.S.C. § 2802(b)(2)(A)(i), (b)(2)(C)(i). This time limitation aims to prevent franchisors from basing termination upon "old and long forgotten events" while still giving the franchisor adequate time to evaluate the events or to work with the franchisee to correct the situation. *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1217 n.2 (7th Cir. 1982).

BP informed Rao on July 14, 2004 that it would be ending its relationship with him. Rao argues that BP first acquired knowledge of his failure to comply with a franchise provision in November 2003, well over 120 days before BP's notification. He therefore maintains that BP's notice was untimely. BP, on the other hand, contends that it acted reasonably when it continued to investigate while Rao was cooperating and maintaining he was a victim of extortion, and that it gave timely notice after Rao stopped cooperating with the investigation and BP concluded he was not in fact an extortion victim.

We find the Second Circuit's discussion in *Nassau Boulevard Shell Service Station, Inc. v. Shell Oil Co.*, 875 F.2d 359 (2d Cir. 1989), instructive. There, a Shell franchisee argued that the PMPA's 120-day clock should have started ticking when another Shell station operator informed Shell that the franchisee had used a credit card not belonging to him at another Shell station. A few months later, Shell learned that the franchisee had been arrested on suspicion of alleged credit card improprieties. Shell conducted further investigation after learning of the arrest. It decided not to terminate the franchise upon a mere arrest since the franchisee had not been convicted of

any crime, and Shell conducted a series of conversations with the franchisee's counsel. Two months after the arrest, in a meeting with Shell, the franchisee admitted he was embarrassed by the credit card incident and that he was undergoing therapy. Within 120 days of that meeting, Shell gave notice of its intent to terminate the franchise. *Id.* at 361.

Although the franchisee argued that Shell "first acquired actual or constructive knowledge" of his failure to abide by the terms of his franchise agreement when Shell first learned of the allegations regarding misuse of a credit card, the Second Circuit held that Shell did not acquire the knowledge contemplated by section 2802 of the PMPA until its meeting with the franchisee. *Id.* at 362. It reasoned that starting the 120-day clock as soon as a franchisor hears an allegation of impropriety was inconsistent with Congress's intent when it passed the PMPA:

> In passing the PMPA, Congress intended to promote, if not mandate, this type of careful approach to termination by franchisors. The practice of such discretion, restraint, and prudence goes a long way toward prevention of arbitrary terminations . . . based on idle rumor and baseless allegations.

*Id.* The Sixth Circuit has also agreed with the Second Circuit's reasoning, stating that "the PMPA was not intended to induce [the franchisor] to terminate [the] franchise summarily upon the first suspicion of wrongdoing." *Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1056 (6th Cir. 1994); *see also Desfosses v. Wallace Energy, Inc.*, 836 F.2d 22, 29 (1st Cir. 1987).

We agree that the PMPA does not necessarily require a franchisor to give notice of termination upon the first hint that something might be amiss. That is especially true here. In November 2003, when Rao argues BP "first acquired actual or constructive knowledge" of his noncompliance, Rao was still maintaining that Yarr had extorted him. That month Rao gave Benhart a seventeen-page statement listing the gifts he gave to Yarr, and Rao's statement very clearly expressed the view that he had been the victim of Yarr's extortion. During multiple interviews with Yarr, however, Yarr told BP that he received money and gifts that dealers voluntarily gave him in exchange for his assistance in facilitating transactions.

Benhart therefore had two conflicting stories before him in November 2003. Rao said Yarr had been extorting him, while Yarr said Rao paid the money willingly in exchange for favorable treatment. Benhart made the reasonable decision to continue his investigation. He continued to contact Rao to set up meetings, and Rao said he would meet with Benhart. Rao had maintained all along that he was the victim of extortion—in August 2003 when he met with Benhart and said he had been extorted, in November 2003 when he argues the clock should have started to run, and even during the preliminary injunction hearing before the district court in this case. Rao never admitted he had engaged in wrongdoing. In these circumstances, BP acted reasonably when it continued to investigate before it made the termination decision.

Under Rao's rule, although the PMPA's notice require-
ment is in place largely to protect franchisees, a franchisor
would need to terminate the franchise upon the mere
suspicion that its franchisee was not acting honorably.
But "[a]n interpretation of section 2802 which fosters
termination based on rumor or suspicion surely does not
afford the protection from arbitrary and discriminatory
terminations that Congress intended." *Nassau Blvd.*, 875
F.2d at 362. Of course, there could come a time when a
franchisor's purported investigation lasts an unrea-
sonable amount of time. There is no indication here,
however, that BP dragged its feet or acted unreasonably
during its investigation, especially since Rao had not
admitted that he had engaged in bribery. Rao told Benhart
in June 2004 that he would no longer cooperate with BP's
investigation. BP management concluded soon
afterwards that Rao had engaged in bribery and fraud, and
it notified him on July 14, 2004, less than 120 days later, of
its intent to terminate the franchise relationship. We
conclude that BP acquired the knowledge contemplated
by sections 2802(b)(2)(A) and (b)(2)(C) when Rao said he
would not cooperate with BP's investigation any longer
and that the notice BP gave was therefore timely.

In light of our decision, we need not address whether the
PMPA applies to the Morton Grove station. Rao maintains
that it does, while BP argues that the type of agreement
in place at that station falls outside the scope of the
PMPA and therefore outside its notice requirements.
Even if the PMPA applied to the Morton Grove station as
Rao argues, summary judgment on the PMPA claim
was proper because the notice was timely.

B. Summary Judgment Proper on Breach of Contract Claims

Rao also maintains that his breach of contract claims should proceed past summary judgment. He contends that the district court erred when it concluded that the PMPA preempted his breach of contract claim regarding the Franklin Park station. Even if Rao were correct in that regard, however, he has not demonstrated that summary judgment in BP's favor in his breach of contract claim was incorrect.

Rao maintains that BP breached the contract it had with him regarding the Franklin Park station by terminating its relationship with him without good cause and for arbitrary, discriminatory, and retaliatory reasons; for violations that did not relate to the station; and by refusing to approve a buyer for the Franklin Park station. The Franklin Park franchise agreement contains a specific provision, though, allowing BP to terminate its relationship with Rao upon the "[c]ommission . . . of any deceptive, fraudulent, illegal, immoral, or other improper act relevant to the operation of the business on the Facility which is detrimental to [BP Products] . . . ." As we discussed, the undisputed facts reflect that Rao engaged in fraudulent activities relevant to the operation of the station, namely paying off Yarr in exchange for favorable treatment. Therefore, summary judgment was proper on Rao's breach of contract claim.

C.  Dismissal of RICO Claims Proper

Rao also appeals the dismissal of the RICO claims he asserted in his complaint against BP (referred to as Amoco in the complaint), Yarr, Thomason, and Schumacher. The district court granted the defendants' motion to dismiss the RICO claims for failure to state a claim upon which relief could be granted. Our review of the grant of a motion to dismiss is de novo, and our inquiry asks whether the plaintiff has provided allegations that "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 550, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-53 (2009).

Rao's complaint purported to allege several RICO counts. He listed a claim for violation of 18 U.S.C. § 1962(a), which prohibits the use or investment of income in an enterprise that was derived from a pattern of racketeering activity. A section 1962(a) claim requires a showing that a defendant: (1) received income from a pattern of racketeering activity; (2) used or invested that income in the operation of an enterprise; and (3) caused the injury complained of by the use or investment of racketeering income in an enterprise. *Vicom, Inc., v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 n.6 (7th Cir. 1994). Rao's complaint merely restates the elements of section 1962(a) in boilerplate fashion and contains no suggestion that money was used or invested in the operation of an enterprise or that he suffered an injury caused by the use or investment of racketeering income. Accordingly, the district court properly dismissed this claim. *See Twombly*,

550 U.S. at 555 (complaint must allege more than "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss).

Rao's complaint also invoked 18 U.S.C. § 1962(c), which makes it

> unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

A claim under section 1962(c) therefore requires a plaintiff to demonstrate (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Vicom, Inc.*, 20 F.3d at 778.

The defendants maintain that the complaint fails to state a claim for several reasons, including that it fails to allege an enterprise. The RICO statute defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). At issue here is the "association-in-fact" type of enterprise. After oral argument in this case, the Supreme Court accepted certiorari on the question of whether, in order to establish an association-in-fact enterprise, there must be some showing of an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it

engages. *Boyle v. United States*, 129 S. Ct. 29 (2008) (granting writ of certiorari). The Supreme Court held in *Boyle* that an association-in-fact enterprise under RICO must have a "structure," although the jury need not receive an instruction in these terms. *Boyle v. United States*, 129 S. Ct. 2237, 2241 (2009). The Court wrote that an association-in-fact enterprise must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 2244. However, it clarified that RICO enterprises are not limited to "business-like entities" and that they need not have a hierarchical structure or a "chain of command." *Id.* at 2246; *cf. Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 804 (7th Cir. 2008).

A section 1962(c) claim also requires that there be a "pattern" of racketeering activity, which is an element distinct from the enterprise requirement. *Boyle*, 129 S. Ct. at 2245. The compensable harm in a cause of action under section 1962(c) "necessarily is the harm caused by predicate acts *sufficiently related to constitute a pattern*, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)) (emphasis added).

With these principles in mind, we turn to the complaint in this case. When the district court granted the motion to dismiss the RICO counts, it noted that many of the elements of the RICO claims were set forth

in boilerplate fashion. It also wrote that the amended complaint alleged violations of three different RICO subsections in the same count and did not provide any time frame for the events in question in that count. The district court further noted in its opinion that Rao had indicated a desire to include additional acts and to clarify certain allegations and so for that reason it would not detail all of the RICO counts' pleading deficiencies. Although the defendants did not file their motion for summary judgment until six months later, Rao did not further amend his complaint, and Rao's counsel on appeal acknowledges that the RICO counts "could have been pleaded more artfully."

Rao does not contest the district court's determination that the statute of limitations bars consideration of acts before September 16, 2000. The allegations in his complaint that he maintains are sufficient to state a claim for violation of section 1962(c) are: (1) Yarr, Thomason, and Schumacher forced Rao to sell his share of a station to Thomason at a false price, under the threat that he would lose his other franchises if he did not, Am. Compl. ¶ 20(e); (2) after Rao spoke with the FBI, unnamed "[BP] employees" told Rao his franchises would be terminated if he sought help, Am. Compl. ¶ 20(g); and (3) BP allowed Yarr to force Rao into purchasing two parcels of its land so that BP would not have to purchase the gas stations he maintained at fair market value, under the threat of increased costs and the loss of his business if he refused, Am. Compl. ¶ 20(j).

It is difficult to see an enterprise with a structure that engaged in a pattern of racketeering activity from these

allegations. Even though the Supreme Court has now made clear that the "structure" requirement can be satis-fied in ways other than by demonstrating a business-like entity and that enterprise participants can come and go, an association-in-fact enterprise still requires a showing of a "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 129 S. Ct. at 2243 (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)). The allegations to which Rao points, however, contain different actors for each event—Yarr, Thomason, and Schumacher in one instance; different unnamed BP employees in another; and then the company (and possibly Yarr) in the third. These allegations do not indicate how the different actors are associated and do not suggest a group of persons acting together for a common purpose or course of conduct. *See Stachon v. United Consum-ers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000) (upholding dismissal of RICO claim that failed to show the acts complained of were "the work of an organization, how-ever loose-knit"). The allegations to which Rao points also fail to set forth a pattern of related acts in connection with an enterprise's conduct. For example, in the first allegation at issue, individuals stood to benefit if Rao sold his share of a gas station, while the third alleges that a large corporation did not want to buy property at fair market value. Rao had plenty of time to amend his complaint and did not do so, and we decline to overturn the district court's dismissal of this count for failure to state a claim.

Finally, Rao's claim also invoked 18 U.S.C. § 1962(d), which prohibits a conspiracy to violate any other RICO

provision. In a manner similar to his section 1962(a) claim, Rao's complaint only recited generically that the defendants had "conspired to violate 18 USCA 1962(a), 18 USCA 1962(b) and/or 18 USCA 1962(c)." He does not develop an argument that the dismissal of the claim containing only boilerplate allegations was improper, *cf. Twombly*, 550 U.S. at 555, and we affirm the dismissal of that claim as well.

### D.   Dismissal of Fraud Claim Proper

Finally, we address the dismissal of Rao's state-law fraud claim. Federal Rule of Civil Procedure 9(b) requires that fraud claims be pled with particularity. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). This means the "who, what, when, where, and how" of the alleged fraud. *Id.* Rao makes a brief argument on appeal that the following allegations in his complaint sufficiently pled a fraud claim: (1) Yarr told Rao that he must sell the Wilmette gas station to Thomason, must pay Yarr $10,000, and would lose his leases in other stations if he refused, and (2) Yarr told Rao that if he refused to exercise his right of first refusal to purchase certain land, Yarr would make sure all of his leases at other locations were terminated and put him out of business. The defendants argue that the allegations do not specify the "when" and "where" of the alleged fraud.

Even if that information can be gathered by cobbling together allegations in other parts of the complaint, upholding the dismissal is proper for another reason. A typical element of fraud under Illinois law is that the

defendant made a false statement of material fact, *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004), and Rao's complaint does not allege a false statement of a material fact. Illinois does recognize a promissory fraud claim, but it requires that "when the promise was made, the promisor had no intent to fulfill it; if the promisor simply later changed his mind, an action for fraud will not lie." *Ass'n Ben. Servs. Co. v. Caremark RX, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007); *see also Byung Moo Soh v. Target Mktg. Sys.*, 817 N.E.2d 1105 (Ill. App. Ct. 2004) ("'Promissory fraud' is a form of fraud based upon a false representation of intent concerning future conduct, e.g., a promise to perform a contract where there is actually no intent to perform the contract."). That is, a fraud claim requires that "*at the time the allegedly fraudulent statement was made*, it was an intentional misrepresentation." *Caremark RX*, 493 F.3d at 853. No such allegation exists here either, nor does Rao argue to the contrary. He also does not contend there was a scheme to defraud him. The motion to dismiss Rao's fraud claim was properly dismissed as well.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.