In the

# United States Court of Appeals

### For the Seventh Circuit

No. 17-2988

JOHN MCMAHAN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

DEUTSCHE BANK AG, *et al.*,

*Defendants-Appellee*s.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-04356 — **Sharon Johnson Coleman**, *Judge*.

ARGUED APRIL 19, 2018 — DECIDED JUNE 13, 2018

Before RIPPLE, MANION, and KANNE, *Circuit Judges*.

MANION, *Circuit Judge*. In 2001, John McMahan and his
wholly owned corporation, Northwestern Nasal and Sinus
Associates, S.C.,[1] participated in a tax shelter known as "Son
of BOSS." The shelter "is a variation of a slightly older al-

---

[1] For ease of reference, and because the parties have not indicated a
material distinction between McMahan and his corporation, we will refer
to McMahan and his corporation collectively as "McMahan."

leged tax shelter known as BOSS, an acronym for 'bond and options sales strategy.'" *Kligfeld Holdings v. Comm'r*, 128 T.C. 192, 194 (2007). It "was aggressively marketed by law and accounting firms in the late 1990s and early 2000s" and involves engaging in a series of transactions to create an "artificial loss [that] may offset actual—and otherwise taxable—gains, thereby sheltering them from Uncle Sam." *Am. Boat Co., LLC v. United States*, 583 F.3d 471, 474 (7th Cir. 2009). Unfortunately for McMahan, the Internal Revenue Service (IRS) considers the use of this shelter abusive. *See* I.R.S. Ann. 2004-21 I.R.B. 964 ("The Service has determined that Son of Boss transactions are abusive and were designed, marketed, and undertaken solely to create tax benefits unintended by any reasonable interpretation of the tax laws."). The IRS initiated an audit of McMahan's 2001 tax return in 2005. In 2010, the IRS notified McMahan it was increasing his taxable income for 2001 by approximately $2 million.

In 2012, McMahan filed this lawsuit in Illinois state court against Robert Goldstein (his accountant), American Express Tax and Business Services (Amex) (the firm that prepared his tax return), and Deutsche Bank AG and Deutsche Bank Securities Inc. (collectively, Deutsche Bank) (the entities that facilitated the transactions necessary to perpetrate the shelter). McMahan claims these defendants harmed him by convincing him to participate in the shelter. Deutsche Bank removed the case to the district court, citing the diversity jurisdiction statute, 28 U.S.C. § 1332. After a series of procedural steps described below, the district court dismissed McMahan's claims against Goldstein and Amex for lack of prosecution and granted summary judgment to Deutsche Bank on statute of limitations grounds. McMahan appeals. We affirm.

**I.**

**A. Background[2]**

In June 2000, McMahan met with Goldstein, who encouraged McMahan to participate in a Son of BOSS tax shelter. He indicated to McMahan that the shelter was legal and legitimate. To implement the shelter, the law firm of Jenkens & Gilchrist was to draft a letter confirming the probable legality of the shelter, and Goldstein told McMahan Deutsche Bank would facilitate the necessary transactions and Amex would prepare McMahan's tax returns. McMahan participated in the shelter in 2000 and 2001. In 2001, McMahan paid fees to Goldstein, Amex, Jenkens & Gilchrist, and Deutsche Bank for their roles in the scheme. He claimed the losses he generated on his 2001 tax returns.

At some point in 2002, Goldstein told McMahan Son of BOSS was no longer legitimate. This was McMahan's first indication that all was not well with Son of BOSS. But it was not the last.

In 2003 and 2004, the IRS published notices stating its position that Son of BOSS was illegitimate. *See* I.R.S. CCN CC-

---

[2] In the proceedings below, Deutsche Bank submitted a statement of facts in support of its motion for summary judgment, but McMahan did not submit one in opposition, so the district court took the facts stated in Deutsche Bank's statement as admitted. *See* N.D. Ill. Local Rule 56.1(a)(3), (b)(3) (requiring parties to submit a statement of material facts and response when filing and responding to a summary judgment motion, respectively); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). Accordingly, "[w]e recount the narrative that follows with that in mind." *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009).

2003-020 (noting the IRS had listed Son of BOSS "as an abusive tax shelter" since September 5, 2000); I.R.S. Ann. 2004-21 I.R.B. 964 (announcing a settlement initiative for taxpayers who had participated in Son of BOSS shelters). McMahan's tax counsel, Chuhak & Tecson, P.C., forwarded the 2004 notice concerning an IRS settlement initiative to McMahan. In January 2005, McMahan's tax counsel informed him Illinois was offering a compliance program to avoid penalties for participating in abusive tax shelters, including Son of BOSS. Despite these notices, McMahan did not participate in any amnesty, settlement, or compliance program. He claims the defendants told him those programs did not apply to his situation. However, McMahan's counsel did send a letter to Deutsche Bank asking it not to disclose McMahan's name to the IRS.

In February 2005, McMahan's counsel sent him a letter concerning the settlement of a class action against Jenkens & Gilchrist. The lawsuit, filed in the Southern District of New York in 2003, alleged that Jenkens & Gilchrist breached fiduciary duties by issuing incorrect opinions concerning tax shelters. It also alleged that Deutsche Bank had promoted the shelter and failed to advise about the inaccuracy of Jenkens & Gilchrist's opinions. Jenkens & Gilchrist had agreed to settle the suit against it for $81.5 million. The letter from his counsel informed McMahan that he "should expect to receive an official notification and claim form in the near future."[3]

---

[3] Letter from Albert Grasso to Dr. John and Lynn McMahan, R. 143-10.

On the same day McMahan's counsel sent him that letter, the IRS sent McMahan notice that it was initiating an audit of his 2001 tax returns. Five years later, in October 2010, the IRS issued a deficiency notice to McMahan announcing the IRS was adjusting his taxable income for 2001 upward by approximately $2 million. McMahan ultimately settled with the IRS in May 2012.

On March 26, 2012, McMahan filed this lawsuit against Deutsche Bank, Goldstein, and Amex in the Circuit Court of Cook County. McMahan alleged a multitude of malfeasance connected with his participation in the shelter: breach of contract, accounting malpractice, breach of fiduciary duty, and more. On June 5, 2012, Deutsche Bank removed the case to the district court.

## B. Dismissal for Lack of Prosecution

On December 12, 2013, the district court ordered McMahan to arbitrate his claims against Amex and Goldstein pursuant to a term of their engagement letter. The parties then communicated about arbitration in February 2014, the last communication from McMahan's counsel being an email sent on February 27. From that point, Amex and Goldstein heard nothing from McMahan for nearly sixteen months. In May 2014, Goldstein died.

On June 11, 2015, McMahan's counsel sent an email to counsel for Amex and Goldstein announcing McMahan was ready to proceed with arbitration. The parties had some further communication, but on June 25, 2015, counsel for Amex and Goldstein informed McMahan's counsel that they would be filing a motion to dismiss for failure to prosecute. They filed the motion the same day.

McMahan filed a response to the motion and included affidavits from himself and counsel. The affidavits recount that McMahan had spent most of the sixteen months of silence between communications with Amex and Goldstein's counsel trying to find an expert witness and trying to get the money together to pay such an expert.

On September 1, 2015, the district court made an oral ruling granting the motion and dismissing McMahan's claims against Goldstein and Amex. The court concluded McMahan's conduct was dilatory and constituted "effective abandonment of [his] claim."[4] It also noted that "the case centers on [McMahan's] discussions with Goldstein," who had died.[5] The district court concluded that, "in the context of this particular case, every passing day increases…the defendants' difficulty in mounting an adequate defense as witnesses become more difficult to locate."[6] Over a year later, McMahan filed a motion to reconsider, which the district court denied on September 5, 2017.

**C. Summary Judgment**

In 2012, Deutsche Bank moved to dismiss the case against it as time barred, arguing that McMahan, whose injuries accrued over ten years earlier, filed his complaint well outside the five-year statute of limitations. The district court, however, relying on the Illinois Supreme Court's decision in *Khan v. Deutsche Bank AG*, 978 N.E.2d 1020 (Ill. 2012), denied the motion. The district court interpreted *Khan* as imposing a

---

[4] Transcript of Proceedings at 6, R. 148-1.

[5] *Id.*

[6] *Id.*

bright-line rule that a taxpayer wronged in the ways that McMahan alleges is not sufficiently aware of his claim, and thus the statute of limitations does not begin to run, until he receives his deficiency notice from the IRS. Because McMahan did not receive his deficiency notice until 2010, the district court held his 2012 complaint was timely.

In 2015, the Illinois Appellate Court decided *Lane v. Deutsche Bank, AG*, 44 N.E.3d 548 (Ill. App. Ct. 2015), expressly negating the bright-line interpretation of *Khan*. *Id.* at 554; *see also Lane v. Deutsche Bank*, 48 N.E.3d 1093 (Ill. 2016) (denying petition for leave to appeal). In light of *Lane*, the district court allowed the parties to pursue discovery concerning the statute of limitations and submit summary judgment briefing on that issue. On September 5, 2017, the district court concluded it was undisputable McMahan was on notice of his claims at least by February 2005 when he received notice that the IRS was performing an audit. As that meant he filed his complaint outside the statute of limitations, the court granted summary judgment to Deutsche Bank.

## II.

McMahan appeals both the dismissal for lack of prosecution and the grant of summary judgment. These are two distinct rulings, so we address each individually.

### A. Dismissal for Lack of Prosecution

We begin with the dismissal for lack of prosecution. Federal Rule of Civil Procedure 41(b) provides that "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." We review a district court's decision to

dismiss pursuant to Rule 41(b) for abuse of discretion. *Webber v. Eye Corp.*, 721 F.2d 1067, 1068 (7th Cir. 1983). "So long as the district judge's analysis was not tainted by a legal error or the failure to consider an essential factor, we will reverse only…if the decision strikes us as fundamentally wrong." *Moffitt v. Ill. State Bd. of Educ.*, 236 F.3d 868, 873 (7th Cir. 2001) (citations omitted).

"The sanction of dismissal is the most severe sanction that a court may apply, and its use must be tempered by a *careful* exercise of judicial discretion." *Webber*, 721 F.2d at 1069 (quoting *Durgin v. Graham*, 372 F.2d 130, 131 (5th Cir. 1967)). Accordingly, we have directed district courts ideally to consider the following factors when entertaining a Rule 41(b) motion:

> [T]he frequency and magnitude of the plaintiff's failure to comply with deadlines for the prosecution of the suit, the apportionment of responsibility for those failures between the plaintiff and his counsel, the effect of those failures on the judge's calendar and time, the prejudice if any to the defendant caused by the plaintiff's dilatory conduct, the probable merits of the suit, and the consequences of dismissal for the social objectives of the type of litigation that the suit represents.

*Aura Lamp & Lighting Inc. v. Int'l Trading Corp.*, 325 F.3d 903, 908 (7th Cir. 2003). Ultimately, the decision to dismiss "depends on all the circumstances of the case." *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 561 (7th Cir. 2011).

Considering all the circumstances of this case, we conclude the district court did not abuse its discretion. True, McMahan can confidently argue that he did not miss any deadlines, because the court imposed none. But looming larger is the simple fact of McMahan's delay—the sixteen months of silence. McMahan claims he was actively pursuing the case by trying to arrange for an expert witness for the arbitration, but he never communicated that to his opponents. Additionally, McMahan's own evidence shows that a primary reason for the delay was McMahan's difficulty trying to get the money together to pay an expert. Particularly given the lack of communication, it was not an abuse of discretion for the district court to discount that excuse. *Cf. James v. McDonald's Corp.*, 417 F.3d 672, 681 (7th Cir. 2005) (affirming dismissal where plaintiff claimed "she 'very much wanted to pursue her cause,' but could not because the district court compelled her to arbitrate her claims, which she could not afford to do").

In addition, the district court reasonably concluded the delay prejudiced Goldstein and Amex. An unreasonable delay gives rise to a presumption of prejudice. *Washington v. Walker*, 734 F.2d 1237, 1239 (7th Cir. 1984). Such a presumption is particularly apt in this case, where the events at issue took place over a decade before McMahan filed the lawsuit and where a key witness, Goldstein, has died.[7] In this situa-

---

[7] It should be noted that Goldstein's death, on its own, would not be enough to show prejudice in this case. Goldstein died in May 2014, a mere three months after the last communication from McMahan. There is no indication that McMahan delayed in anticipation of Goldstein's death or that Goldstein would not have died prior to the arbitration even if McMahan had more actively pursued his suit. However, Goldstein's death exacerbates the difficulty of finding witnesses to events that oc-

tion, it was entirely reasonable for the district court to conclude that "every passing day…increases the defendant's difficulty in mounting an adequate defense." The district court took all these circumstances into account and concluded that failing even to communicate with opposing counsel for sixteen months was an unreasonable delay that caused prejudice. That was not an abuse of discretion.

McMahan's arguments that the district court did not consider a lesser sanction first and that the district court did not warn him that dismissal was coming do not convince us otherwise. There is no requirement to enter lesser sanctions before dismissing a case for lack of prosecution. *Ball v. City of Chicago*, 2 F.3d 752, 756 (7th Cir. 1993). Neither is a warning required in every case. "[T]he warning requirement is not a 'rigid rule…. It was intended rather as a useful guideline to district judges—a safe harbor to minimize the likelihood of appeal and reversal.'" *Kasalo*, 656 F.3d at 562 (alteration in original) (citation omitted) (quoting *Fischer v. Cingular Wireless, LLC*, 446 F.3d 663, 665 (7th Cir. 2006)). Those opinions admonishing a district court for dismissing a case without warning involve *sua sponte* dismissals. *See, e.g.*, *In re Bluestein & Co.*, 68 F.3d 1022, 1027 (7th Cir. 1995). There is no need to warn that dismissal is coming when, as here, the defendant files a motion with notice to the plaintiff asking for dismissal. *Morris v. Morgan Stanley & Co.*, 942 F.2d 648, 652 (9th Cir. 1991). In such a situation, the plaintiff has an opportunity to explain itself by responding to the motion, as McMahan did here. If, after hearing from both sides, the district court believes dismissal is appropriate, no purpose would be served

---

curred so far in the past and is properly considered among the totality of the circumstances.

by issuing a warning: the motion itself was the warning. *Cf. Johnson v. Kamminga*, 34 F.3d 466, 468 (7th Cir. 1994) (rejecting a warning requirement that "would in effect be granting each litigant one opportunity to disregard the court's schedule without fear of penalty"). There was no abuse here.

**B. Summary Judgment**

We turn to the grant of summary judgment for Deutsche Bank on statute of limitations grounds. "The standard for summary judgment is well established: with the court drawing all inferences in the light most favorable to the non-moving party, the moving party must discharge its burden of showing that there are no genuine questions of material fact and that [it] is entitled to judgment as a matter of law." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). Once the movant has carried this burden, it passes to the non-movant "to come forward with specific facts showing that there is a genuine issue for trial." *Id.* "The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Madison v. Frazier*, 539 F.3d 646, 652 (7th Cir. 2008).

Because this case comes to us under the diversity statute, "we apply state substantive law." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1088 (7th Cir. 2018) (internal quotation marks omitted) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)). Substantive law includes statutes of limitations and "rules that are an 'integral part of the statute of limitations,' such as tolling and equitable estoppel." *Hollander v. Brown*, 457 F.3d 688, 694 (7th Cir. 2006) (quoting *Walker v. Armco Steel Corp.*, 446 U.S. 740, 748 (1980)). The parties do not dispute that Illinois law applies to this case.

By the time the district court entered summary judgment against McMahan, only one of his claims against Deutsche Bank was still live: that Deutsche Bank aided and abetted Jenkens & Gilchrist in misrepresenting the legitimacy of the shelter. That claim was subject to a five-year statute of limitations. 735 ILCS 5/13-205. There is no dispute that McMahan's claim accrued in 2001 when he paid fees to Deutsche Bank for its role in facilitating the shelter-related transfers. Therefore, removing all other considerations, the limitations period on McMahan's claim would have expired in 2006. McMahan filed his complaint in 2012. He relies on the "discovery rule" to overcome that six-year gap.

Under Illinois law, the discovery rule "postpone[s] the start of the period of limitations until the injured party knows or reasonably should know of the injury and knows or reasonably should know that the injury was wrongfully caused." *Khan*, 978 N.E.2d at 1028–29; *accord Feltmeier v. Feltmeier*, 798 N.E.2d 75, 89 (Ill. 2003). It is only at that point "the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed." *Khan*, 978 N.E.2d at 1029 (quoting *Nolan v. Johns-Manville Asbestos*, 421 N.E.2d 864, 868 (Ill. 1981)).

The parties direct us primarily to two Illinois cases, *Khan* and *Lane*, both of which apply the discovery rule in suits against Deutsche Bank by taxpayers who participated in a tax shelter. In *Khan*, the Illinois Supreme Court held the plaintiffs did not "discover" their claims against the defendant bank until they received the notice of deficiency from the IRS. 978 N.E.2d at 1036.

Three years later, the plaintiff in *Lane* argued the supreme court's holding in *Khan* established a bright-line rule: he did not have notice of his claims against the bank until the IRS notified him of his tax deficiency. *Lane*, 44 N.E.3d at 554. The Illinois Appellate Court explicitly rejected that argument. *Id.* Instead, the court concluded that particular events occurring after the cause of action accrued served to put the plaintiff on notice that he had claims against the bank. *Id.* at 555–56. Specifically, the court noted the plaintiff learned of a memo circulated by his contact at his accounting firm that the tax shelter in which he had participated was illegitimate; the plaintiff learned the IRS was auditing "the entity through which [his] losses flowed"; and the attorney who prepared the letter indicating the tax shelter was legally acceptable "[pleaded] guilty to defrauding the IRS by authoring false opinion letters and entering into a phony consulting agreement." *Id.* at 555. The court reasoned that these events should have put the plaintiff on notice that something was amiss with the tax shelter. *Id.* The IRS's issuance of the deficiency notice in 2013 simply made him aware of all his potential damages. *Id.*

In this case, McMahan participated in a tax shelter in 2001 and did not receive a deficiency notice until 2010. But, similar to the plaintiff in *Lane*, events in the interim should have put him on notice that he may have had claims against Deutsche Bank. Most notably, in 2005 McMahan became aware of a class action involving claims of breach of fiduciary duty against Jenkens & Gilchrist relating to its role in promoting tax shelters. The letter informing him of the class action also indicated McMahan's entitlement to recover in the settlement of that suit. The very same day he received that letter, the IRS notified McMahan it was auditing his

2001 tax returns. By at least that point, as the district court concluded, McMahan had sufficient notice that something was not right to put the impetus on him to investigate further whether he had claims against Deutsche Bank. *Cf. Marvel Eng'g Co. v. Matson, Driscoll & D'Amico*, 501 N.E.2d 948, 952 (Ill. App. Ct. 1986) ("[P]laintiff's lack of diligence precludes application of the discovery rule in its favor."). Because the undisputed facts show McMahan was on notice no later than 2005, he should have filed his complaint no later than 2010. He waited until 2012, so summary judgment was appropriate.

### III.

In accordance with the foregoing, we AFFIRM the district court in all respects.