# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Khan v. Deutsche Bank AG*, 2012 IL 112219

---

| | |
|---|---|
| Caption in Supreme Court: | SHAHID R. KHAN *et al.*, Appellees, v. DEUTSCHE BANK AG *et al.*, Appellants. |
| Docket Nos. | 112219, 112221, 112223 cons. |
| Filed | October 18, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where plaintiffs' 2009 lawsuit complained of 1999 and 2000 investments which were placed with the defendants in anticipation of tax advantages and profits that did not materialize, the complaint was timely under the discovery rule when filed within the applicable limitation period after plaintiffs' receipt of tax deficiency notices in 2008. |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Champaign County, the Hon. Jeffrey B. Ford, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. |

| Counsel on Appeal | Thomas F. Falkenberg and Benjamin M. Whipple, of Williams Montgomery & John Ltd., of Chicago, and Kay Nord Hunt, of Lommen, Abdo, Cole, King & Stageberg, P.A., of Minneapolis, Minnesota, for appellant Grant Thornton LLP. |
| --- | --- |
| | Joel D. Bertocchi and Joshua G. Vincent, of Hinshaw & Culbertson, LLP, of Chicago, and Theresa Trzaskoma and Adam Hollander, of New York, New York, and Christopher Wimmer, of San Francisco, California, all of Brune & Richard, LLP, for appellant David Parse. |
| | J. Timothy Eaton and Jonathan B. Amarilio, of Shefsky & Froelich Ltd., of Chicago, and Allan N. Taffet, Kirk L. Brett and Keith Blackman, of Duval & Stachenfeld LLP, of New York, New York, for appellants Deutsche Bank AG and Deutsche Bank Securities, Inc. |
| | James D. Green, of Thomas, Mamer & Haughey, LLP, of Champaign, David R. Deary, J. Dylan Snapp and Carol E. Farquhar, of Loewinsohn Flegle Deary, LLP, of Dallas, Texas, and David C. Frederick, Brendan J. Crimmins and Emily T.P. Rosen, of Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., of Washington, D.C., for appellees. |
| Justices | JUSTICE GARMAN delivered the judgment of the court, with opinion. |
| | Justices Freeman, Thomas, Karmeier, and Burke concurred in the judgment and opinion. |
| | Justice Theis concurred in part and dissented in part, with opinion, joined by Chief Justice Kilbride. |

**OPINION**

¶ 1   On July 6, 2009, plaintiffs Shahid R. Khan, his wife, Ann C. Khan, and various of their business entities filed a multicount complaint in the circuit court of Champaign County against defendants for losses incurred in connection with a series of investment strategies entered into in 1999 and 2000, a primary purpose of which was to create artificial tax losses for plaintiffs. Instead, the Internal Revenue Service (IRS) disallowed the resulting tax losses and determined that plaintiffs owed back taxes, penalties, and interest. Pertinent to this consolidated appeal, defendants Deutsche Bank AG, Deutsche Bank Securities, Inc., David Parse, and Grant Thornton filed motions to dismiss pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615, 2-619 (West 2008)). The section 2-

619 motions alleged that plaintiffs' action was time-barred. The trial court granted the motions and entered an order under Supreme Court Rule 304(a), finding no just reason to delay enforcement or appeal of its rulings. Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010). The appellate court reversed and remanded. 408 Ill. App. 3d 564. This court granted defendants' petitions for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)) and consolidated the cases for review.

¶ 2                                BACKGROUND

¶ 3      Plaintiffs' 11-count complaint sought damages for breach of fiduciary duty, negligence/professional malpractice, negligent misrepresentation, disgorgement, rescission, declaratory judgment, breach of the duty of good faith and fair dealing, fraud, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, breach of contract, and civil conspiracy. Plaintiffs alleged that defendants, pursuant to a common scheme, advised plaintiffs to undertake certain investment strategies, referred to as the 1999 Digital Options Strategy and the 2000 COINS Strategy. According to plaintiffs, defendants advised them that the investment strategies could yield a substantial profit and also legally minimize plaintiffs' federal and state income tax liability. Plaintiffs alleged that defendants knew or should have known that the investment strategies would not yield such profits or tax benefits because defendants knew that the IRS was investigating the same or substantially similar transactions and had concluded that the transactions were illegal tax shelters. Defendants did not inform plaintiffs of these facts; rather, plaintiffs alleged, defendants' primary motive in pitching their scheme was to exact significant fees and commissions from plaintiffs. Plaintiffs further alleged that they were unknowledgeable and unsophisticated concerning tax laws and tax-advantaged investment strategies and that they relied on their trusted legal, accounting, and tax advisors for comprehensive legal, accounting, tax, and investment advice.

¶ 4      Following is a brief summary of the factual allegations of plaintiffs' complaint. A fuller statement of the facts is contained in the appellate court opinion.

¶ 5                      The 1999 Digital Options Strategy

¶ 6      In 1999, plaintiff Shahid Khan was involved in negotiations to purchase a Canadian company owned by Japanese investors. The investors requested that Khan pay them the sale proceeds in Japanese yen. As Khan had no experience with foreign currency, he sought a referral to any potential advisors with foreign currency trading experience. He was referred to Paul Shanbrom, a tax partner at BDO Seidman (BDO). At a meeting, Shanbrom suggested that Khan invest in the 1999 Digital Options Strategy. Shanbrom advised Khan that BDO's tax professionals had devised tax-advantaged investment plans that would provide an above-average rate of return and minimize tax obligations and that the 1999 Digital Options Strategy was completely legal. Shanbrom recommended defendants David Parse and Deutsche Bank to execute the options, representing that Parse and Deutsche Bank had special expertise in foreign currency investments. He also told Khan that he would receive a legal opinion from an independent law firm that would confirm the propriety of the 1999 Digital Options Strategy, protect Khan in the event of an IRS audit, and prevent the IRS from assessing plaintiffs with penalties in the unlikely event of an audit. Shanbrom

recommended the law firm of Jenkens & Gilchrist to provide this opinion. Shanbrom set up a conference call in which he, Khan, and Parse discussed foreign currency trading. During the call, Shanbrom and Parse reiterated what Shanbrom had earlier told Khan about the legality of the 1999 Digital Options Strategy. Neither Shanbrom nor Parse informed Khan that the foreign currency digital options were simply private bets with Deutsche Bank as to where the underlying foreign currencies would be on a particular date and time and that Deutsche Bank controlled the outcome. Plaintiffs alleged that, unbeknownst to them, Deutsche Bank was able to control the outcome of the options because the contract with plaintiffs gave Deutsche Bank the power to choose the particular spot rate it wished to use on the designated date and time. According to plaintiffs, Deutsche Bank designed the options so that they would expire "out of the money" and be rendered worthless. Thus, plaintiffs lost the $350,000 premium they paid to Deutsche Bank, which plaintiffs alleged was defendants' plan all along. Based upon the representations of Shanbrom and Parse, Khan decided to invest in the 1999 Digital Options Strategy. To that end and in accordance with defendants' instructions, Khan formed various legal entities to carry out the investment strategy.

¶ 7 Plaintiffs alleged that defendants made material misrepresentations and omissions on which plaintiffs relied to their detriment and that defendants intentionally deceived plaintiffs for the purpose of persuading them to invest in the 1999 Digital Options Strategy.

¶ 8 We quote below the appellate court's explanation of how the 1999 Digital Options Strategy worked:

"The Khans entered into a private contract with Deutsche Bank whereby the Khans, through SRK Wilshire Investments (Wilshire Investments), bought from Deutsche Bank a long option on foreign currency and sold to Deutsche Bank a short option. Thus, there came into existence an opposing pair of options, one long and the other short. These options were designed to cancel each other out. The strike prices of the two options were only a fraction of a penny apart, and the premium that the Khans paid Deutsche Bank for the long option, though large, was almost entirely offset by the premium Deutsche Bank agreed to pay the Khans for the short option (almost but not quite: the Khans paid a net premium to Deutsche Bank of $350,000, the difference between the $35 million that the Khans paid for the long option and the $34,650,000 that Deutsche Bank agreed to pay them for the short option). Because the strike prices of the opposing options were so close together and because Deutsche Bank, as the calculation agent, had the right to select the applicable spot rate from a range of currency rates, it was a virtual certainty that the transaction would be close to a wash—Deutsche Bank would see to that.

So, pursuant to this scheme that was calculated to be a wash on the investment side (and, as we will explain, a loss on the tax side), the Khans formed the necessary business entities and transferred assets between them, all under the guidance of BDO. On November 17, 1999, the Khans formed Wilshire Investments and SRK Wilshire Partners (Wilshire Partners). On November 24, 1999, through Wilshire Investments, the Khans bought and sold the opposing options, which had expiration dates of December 23, 1999. On November 26, 1999, Wilshire Investments contributed its interest in the as-of-yet unexpired options to Wilshire Partners as a

-4-

capital contribution. On December 10, 1999, Wilshire Partners purchased a quantity of Canadian dollars as an investment. On December 23, 1999, both the long option and the short option terminated 'out of the money': the options became worthless, based on the spot rate that Deutsche Bank chose. Of course, both the Khans and Deutsche Bank got to keep the premiums they had paid each other, but Deutsche Bank's premium was $350,000 greater than the premium it had paid to the Khans (or Wilshire Investments). On December 27, 1999, the Khans contributed their interest in Wilshire Partners to Wilshire Investments, causing the dissolution and liquidation of Wilshire Partners. As a distribution in liquidation of Wilshire Partners, all of the investments in foreign currency were distributed to Wilshire Investments.

Consequently, for tax purposes, the Khans' interest in Wilshire Investments had a basis equal to the amount they had paid to Deutsche Bank for the long option, but that amount supposedly was not offset as a result of the assumption by Wilshire Investments of the Khans' obligation to Deutsche Bank on the short option, perhaps on the theory that the short option was only a contingent liability. [Citation.] In other words, the long option counted for purposes of the basis the Khans had in Wilshire Investments, but the short option, which greatly reduced the economic significance of the long option, supposedly did not count. Upon the disposition of the Khans' partnership interest in Wilshire Investments, the expensive long option had expired 'out of the money' and had lost all its value, so the Khans claimed a tax loss equal to the premium they had paid for the long option, even though (because of the offsetting short option) they had not really incurred an economic loss in that amount." 408 Ill. App. 3d at 571-72.

¶ 9                                    The 2000 COINS Strategy

¶ 10        Plaintiffs alleged that in June 2000, aware of Khan's displeasure at losing money on the 1999 Digital Options Strategy, Shanbrom told Khan of another BDO investment strategy that Shanbrom claimed had been designed to provide an even better chance at making a profit than the 1999 Digital Options Strategy and, at the same time, provide clients with the same positive tax benefits found in the 1999 Digital Options Strategy. The same procedure was followed for the 2000 COINS Strategy as had been implemented on the 1999 Digital Options Strategy. Jenkens & Gilchrist would issue an opinion letter confirming the legality of the tax advantages of the 2000 COINS Strategy. Shanbrom again referred Khan to David Parse and Deutsche Bank to implement the plan. Khan had telephone conversations with Parse and a representative of Jenkens, who assured him of the legality of the 2000 COINS Strategy and that the foreign currency digital options were designed in a way to provide Khan with a good chance of making a profit while also legally reducing his taxes. Plaintiffs alleged that the purpose of the promotion by defendants of the 2000 COINS Strategy was to generate large fees from plaintiffs. Based upon the advice and representations of defendants, Khan decided to engage in the 2000 COINS Strategy. The 2000 COINS Strategy was a variation on the 1999 Digital Options Strategy. Again, we quote the appellate court's explanation of how the 2000 COINS Strategy worked:

"On September 29, 2000, using Deutsche Bank as the counterparty, Wilshire

Investments bought and sold offsetting pairs of options tied to foreign-currency exchange rates during specified periods in the future, with extremely close strike prices and a spot rate to be chosen by Deutsche Bank in its sole discretion. The cost of the long option, though large, was mostly (but not entirely) offset by the premium Wilshire received on the sale of the short option. On October 18, 2000, pursuant to BDO's instructions, Wilshire Investments made a capital contribution of these option positions to a partnership formed specifically for purposes of the 2000 COINS Strategy, Thermosphere FX Partners, LLC (Thermosphere). Supposedly, the long option counted toward the basis, without any offset by the short option. On December 6 and 11, 2000, the strike prices on the opposing options were met, with the result that the gain on one option was, roughly speaking, matched by the loss on the other option. The options now were worthless, requiring an adjustment in plaintiffs' basis in Thermosphere. On December 15, 2000, Thermosphere purchased foreign currency. Plaintiffs requested to be redeemed out of Thermosphere, and on December 18, 2000, plaintiffs' entire capital balance was redeemed, and a portion of the foreign currency that Thermosphere had purchased was distributed to them. On December 27, 2000, plaintiffs sold the foreign currency and subsequently claimed an ordinary loss." 408 Ill. App. 3d at 574.

¶ 11    Plaintiffs alleged in their complaint that defendants failed to disclose to Khan that Deutsche Bank retained virtually unlimited discretion to determine whether the investments would pay out and, therefore, could ensure that they would not pay out. Plaintiffs also alleged that defendants failed to disclose that the investments had no reasonable possibility of a profit in excess of the substantial fees plaintiffs paid to Deutsche Bank.

¶ 12    In December 1999, the IRS issued Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property." Plaintiffs alleged that this notice advised taxpayers that transactions wholly lacking in economic substance for the purpose of generating tax losses were not allowable for federal income tax purposes. Plaintiffs alleged that based upon this notice, defendants knew or should have known that the IRS would conclude that the purported losses from the 1999 Digital Options Strategy and the 2000 COINS Strategy were improper and not allowable for tax purposes. Nonetheless, defendants intentionally failed to disclose this information to plaintiffs. In August 2000, the IRS issued Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis." According to plaintiffs, this notice described transactions similar to the 1999 Digital Options Strategy and the 2000 COINS Strategy and indicated that any losses from such transactions were not allowable as deductions for federal income tax purposes. Plaintiffs alleged that despite the clear import of these IRS notices, defendants failed to advise plaintiffs that the purported losses arising from the 1999 Digital Options Strategy and the 2000 COINS Strategy were not allowable for tax purposes and that plaintiffs would be exposed to substantial penalties if they claimed the losses on their tax returns. Instead, defendants improperly represented to plaintiffs that they did not have to disclose the 1999 Digital Options Strategy on their 1999 federal tax returns. In fact, plaintiffs alleged, defendants had failed to register either the 1999 Digital Options Strategy or the 2000 COINS Strategy as tax shelters with the IRS, despite the fact that such registration was required. In addition, the opinion letters issued by Jenkens & Gilchrist verifying the legitimacy of the purported losses generated by the 1999 Digital

Options Strategy and the 2000 COINS Strategy specifically advised plaintiffs that the analysis used by the IRS in Notice 1999-59 was inapplicable to plaintiffs. Plaintiffs alleged that, based on defendants' advice, they filed their 1999 and 2000 tax returns and included the purported losses from the investment strategies.

¶ 13 Plaintiffs alleged that in late 2001 and early 2002, the IRS offered the tax amnesty program, whereby taxpayers who disclosed their involvement in transactions such as the 1999 Digital Options Strategy and the 2000 COINS Strategy could avoid penalties without conceding liability for back taxes or interest. Defendants advised plaintiffs not to participate in the amnesty program. Plaintiffs alleged that the failure to advise them to participate in the program resulted in plaintiffs being assessed substantial penalties and interest that would have been waived had they participated in the amnesty program.

¶ 14 The trial court granted the section 2-619 motions to dismiss filed by Deutsche Bank, Parse, and defendant Grant Thornton, an accounting firm that had prepared Thermosphere's tax returns. The court found that plaintiffs suffered injury in 1999 through 2001 when they paid fees to Deutsche Bank and paid for the opinion letters from Jenkens & Gilchrist. The court noted that plaintiffs had engaged trial counsel in May 2003, who retained an independent accounting firm to assist with the pending IRS audits. The court found that due diligence would have discovered the IRS notices referred to above, which would have put plaintiffs on notice that the tax shelters were illegal. The trial court also granted defendants' section 2-615 motions to dismiss plaintiffs' claim for breach of fiduciary duty, finding that plaintiffs had failed to adequately plead a breach of fiduciary duty and that, in any event, they had disclaimed the existence of such a duty in the written transaction confirmations signed after the trades were made. The trial court relied on an affidavit and the transaction confirmations that were attached to the section 2-615 motions to dismiss. The trial court also granted the motions as to plaintiffs' claim for negligent misrepresentation based upon its finding that plaintiffs had failed to plead the existence of a fiduciary relationship.

¶ 15 The appellate court reversed and remanded. As to the statute of limitations issue, the court found that the limitations period does not begin to run until the IRS makes a formal assessment of the taxpayer's tax liability or the taxpayer agrees with the IRS to pay additional taxes, penalties, or interest. 408 Ill. App. 3d at 602. On the breach of fiduciary duty issue, the appellate court acknowledged the affidavit and contractual documents containing the disclaimers that were attached to the section 2-615 motions to dismiss, but it found that a preagency fiduciary duty existed as a matter of law between the parties based upon this court's decision in *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33 (1994), and that the contractual disclaimers were voidable due to the Deutsche defendants' failure to disclose material facts to Khan concerning the nature of the options transactions and the nondeductibility of the tax losses. *Id.* at 593-94. The appellate court also found that plaintiffs had adequately pleaded a cause of action for negligent misrepresentation. *Id.* at 595. As to Grant Thornton, the appellate court concluded that the trial court erred in granting its section 2-619 motion to dismiss. The court found that plaintiffs' action was timely under the statute of repose found in the accounting malpractice statute of limitations. *Id.* at 611.

¶ 16                                                    ANALYSIS

¶ 17                     I. Statute of Limitations—The Deutsche Defendants

¶ 18     A section 2-619 motion to dismiss admits as true all well-pleaded facts in the complaint, together with all reasonable inferences gleaned from those facts. *Wackrow v. Niemi*, 231 Ill. 2d 418, 422 (2008). When ruling on a section 2-619 motion to dismiss, a court interprets all pleadings and supporting documents in the light most favorable to the nonmoving party. *Id.* A reviewing court applies *de novo* review to a trial court's ruling on the motion. *Id.*

¶ 19     The parties agree that the five-year statute of limitations contained in section 13-205 of the Code of Civil Procedure (Code) (735 ILCS 5/13-205 (West 2008)) applies in this case. That section provides that all civil actions not otherwise provided for "shall be commenced within 5 years next after the cause of action accrued." The heart of the parties' dispute concerns the date on which the limitations period began to run. Deutsche Bank and David Parse (hereafter, Deutsche defendants) argue that the statute of limitations in tort actions begins to run when a plaintiff's cause of action accrues and that plaintiffs' cause of action accrued in 1999 and 2000 when they paid fees to Deutsche Bank for the 1999 Digital Options Strategy and the 2000 COINS Strategy.

¶ 20     The statute refers to the accrual of the cause of action. A cause of action "accrues" when facts exist that authorize the bringing of a cause of action. Thus, a tort cause of action accrues when all its elements are present, *i.e.*, duty, breach, and resulting injury or damage. *Brucker v. Mercola*, 227 Ill. 2d 502, 542 (2007). A mechanical application of the statute of limitations, however, may result in the limitations period expiring before a plaintiff even knows of his or her cause of action. To ameliorate the potentially harsh results of such an application, this court has adopted the "discovery rule," the effect of which is to postpone the start of the period of limitations until the injured party knows or reasonably should know of the injury and knows or reasonably should know that the injury was wrongfully caused. *Witherell v. Weimer*, 85 Ill. 2d 146, 156 (1981); *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 170-71 (1981). At that point, the burden is on the injured person to inquire further as to the possible existence of a cause of action. *Witherell*, 85 Ill. 2d at 156.

¶ 21     This court has noted that the discovery rule formulated by this court:

"is not the same as a rule which states that a cause of action accrues when a person knows or should know of both the injury and the defendants' negligent conduct. Not only is such a standard beyond the comprehension of the ordinary lay person to recognize, but it assumes a conclusion which must properly await legal determination. [Citation.] Moreover, if knowledge of negligent conduct were the standard, a party could wait to bring an action far beyond a reasonable time when sufficient notice has been received of a possible invasion of one's legally protected interests. [Citation.] Also, such a rule would seem contrary to the underlying purpose of statutes of limitations, which is to 'require the prosecution of a right of action within a reasonable time to prevent the loss or impairment of available evidence and to discourage delay in the bringing of claims.' [Citations.]

        We hold, therefore, that when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed. In that way, an injured person is not held to a

standard of knowing the inherently unknowable [citation], yet once it reasonably appears that an injury was wrongfully caused, the party may not slumber on his rights. The question of when a party knew or reasonably should have known both of an injury and its wrongful cause is one of fact, unless the facts are undisputed and only one conclusion may be drawn from them." *Nolan*, 85 Ill. 2d at 170-71.

¶ 22    Along these same lines, this court has noted that the term "wrongfully caused" as used in the discovery rule does not connote knowledge of negligent conduct or knowledge of the existence of a cause of action. That term must be viewed as a general or generic term and not as a term of art. *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 416 (1981). In addition, this court has "never suggested that plaintiffs must know the full extent of their injuries before the statute of limitations is triggered. Rather, our cases adhere to the general rule that the limitations period commences when the plaintiff is injured, rather than when the plaintiff realizes the consequences of the injury or the full extent of her injuries." *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 364 (1995).

¶ 23    The Deutsche defendants argue that plaintiffs' claim is that they were defrauded into investing millions of dollars in the investment strategies. To that end, plaintiffs paid Deutsche Bank over $1 million in fees, which plaintiffs allege was part of the fraud. The Deutsche defendants argue that the tax-related damages were merely additional consequences of the alleged wrongdoing and the fact of these later damages does not postpone the accrual of plaintiffs' claim. Alternatively, the Deutsche defendants argue that the limitations period began to run, at the latest, in May 2003, when plaintiffs hired independent tax counsel, who should have discovered through the exercise of due diligence the IRS notices advising that artificial losses from tax shelters similar to the ones at issue here would be disallowed. The appellate court rejected this argument, concluding that until an assessment or settlement with the IRS, there was no actual harm and hence no accrual of a cause of action, even if, by May 2003, Khan knew that defendants had given him false advice.

¶ 24    Plaintiffs disagree that the statute of limitations began to run in 1999 or 2000. They argue that the Deutsche defendants concealed the fact that plaintiffs would never make a profit on their investment because they did not inform plaintiffs that Deutsche Bank, as calculation agent, maintained complete control over the outcome of the transactions. According to plaintiffs, Deutsche Bank could always pick a spot rate that would ensure that the options expired "out of the money." This would enable Deutsche Bank to pocket the spread between what plaintiffs paid and received from buying and selling the paired options.

¶ 25    Taking as true the well-pleaded facts of plaintiffs' complaint, they have alleged that the Deutsche defendants and others entered into a conspiracy to conceal the true nature of the investment strategies and that they failed to reveal the degree of control Deutsche Bank had over the outcome of the transactions. A reasonable inference from these allegations is that plaintiffs did not know and could not reasonably have discovered the wrongful nature of their injury in 1999 or 2000. The same is true with respect to the purported tax benefits of the investment strategies. The Deutsche defendants argue that plaintiffs should have been alerted by IRS notices issued in 1999 and 2000 that any losses generated by the investment strategies would likely not constitute allowable tax losses. Plaintiffs allege, however, that

the Deutsche defendants themselves were aware of the IRS notices and, despite knowing that the alleged tax-reducing investment strategies would likely be disallowed by the IRS, continued to advise plaintiffs to the contrary. Plaintiffs allege that the Deutsche defendants used purportedly reputable law firms such as Jenkens & Gilchrist to provide plaintiffs with purportedly independent legal opinions concerning the tax-related *bona fides* of the investment strategies, but that, in fact, the opinions provided to plaintiffs were nothing more than "fill in the blank" boilerplate opinions and that Jenkens & Gilchrist was a coconspirator with the Deutsche defendants in the investment schemes. Plaintiffs alleged that the Jenkens & Gilchrist opinion provided to them for the 1999 Digital Options Strategy affirmatively stated that the 1999 IRS notice was inapplicable to the transactions at issue. The opinion provided in connection with the 2000 COINS Strategy stated that the 2000 IRS notice was "more likely than not legally inapplicable." Plaintiffs thus alleged that the Deutsche defendants affirmatively misrepresented both the content and significance of the IRS notices.

¶ 26    Plaintiffs further alleged that in 2001 and 2002, when the IRS announced an amnesty program for those who had claimed tax losses associated with transactions similar to the investment strategies, the Deutsche defendants, in furtherance of their conspiracy, advised plaintiffs not to participate. Plaintiffs alleged the reason for this advice was that one of the conditions of participation required the taxpayer to disclose to the IRS the identities of the individuals and entities who were involved in the marketing, sale, or implementation of the investment strategies, or who received a fee, and that the Deutsche defendants feared disclosure to the IRS of their involvement in the investment strategies. Taking plaintiffs' well-pleaded factual allegations as true, together with reasonable inferences therefrom, we conclude that while a portion of plaintiffs' injury occurred in 1999 and 2000, they could not have been expected at that time, given the alleged actions of the Deutsche defendants and their alleged coconspirators, to discover that their injury was wrongfully caused.

¶ 27    In support of their alternative argument that the statute of limitations began to run, at the latest, in May 2003, the Deutsche defendants assert that in early 2003, plaintiffs received notices from the IRS that it would audit their 1999 and 2000 federal income tax returns. Plaintiffs hired independent tax litigation counsel to represent them in the audit. The Deutsche defendants argue that plaintiffs' counsel should have discovered the existence of the IRS notices concerning the illegal tax shelters in 2003. Plaintiffs respond that because they alleged that the Deutsche defendants advised them to participate in the investment strategies and represented that plaintiffs would realize substantial tax benefits, plaintiffs' claims depend on the ability to establish damages in the form of additional tax liability. Thus, according to plaintiffs, the earliest that they suffered actual harm was when they received a notice of deficiency from the IRS in 2008.

¶ 28    The appellate court held that the statute of limitations did not begin to run in this case until the IRS made a deficiency assessment against plaintiffs or when plaintiffs settled their tax dispute with the IRS, whichever first occurred. In doing so, the appellate court relied on *Federated Industries, Inc. v. Reisin*, 402 Ill. App. 3d 23 (2010). *Federated* involved a lawsuit by the plaintiffs against their accountants. The plaintiffs alleged that the defendants provided negligent accounting services in 2002 and 2003 that required the plaintiffs to pay additional taxes and penalties. The plaintiffs entered into a settlement with the IRS. They returned their

formal written acceptance of the IRS's proposal along with their check for the amount of taxes in 2006. The plaintiffs filed suit in May 2008. The defendants filed a motion to dismiss on the ground that the plaintiffs' action was filed beyond the statute of limitations for accounting malpractice actions. The trial court dismissed the action and the plaintiffs appealed. Under the applicable statute of limitations, an action was required to be filed within two years from the time the plaintiffs knew or should reasonably have known of the alleged act or omission. The statute further provided that in no event shall an action be brought more than five years after the date on which the alleged injurious act or omission occurred. *Id.* at 25-28.

¶ 29     On appeal, the defendants argued that the statute of limitations should begin to run when the plaintiffs were aware of some injury and that this event occurred when plaintiffs consented to the IRS's proposed tax adjustments in December 2005, more than two years before they filed their lawsuit. The appellate court reviewed IRS procedures for examining tax returns and assessing deficiencies. The court noted that the final step in the process is the assessment of a deficiency, either via the taxpayer's consent to a deficiency assessment or the receipt of a final deficiency notice. At that point, the matter is final as to the IRS and subject to legal appeal in federal tax court. The appellate court noted that courts in some jurisdictions hold that the statute of limitations begins to run upon an indication from the IRS of a disagreement with the taxpayer's return, while other courts have held that the limitations period does not begin to run until the issuance of the statutory notice of deficiency. *Id.* at 31-32. In resolving the statute of limitations question, the appellate court relied on a California case, *International Engine Parts, Inc. v. Feddersen & Co.*, 888 P.2d 1279 (Cal. 1995).

¶ 30     In *Feddersen*, the IRS commenced an audit of the plaintiffs' corporate income tax returns. Two years into the audit, the plaintiffs were advised that certain adverse tax consequences would be forthcoming. As a consequence, the plaintiffs withdrew their settlement offer in unrelated litigation and their bank reduced their line of credit because of the plaintiffs' potential additional tax liability. The IRS assessed the tax deficiency and the plaintiffs filed suit two years later. The trial court dismissed the case on statute of limitations grounds and the appellate court affirmed. The California Supreme Court reversed, holding that although the defendants' alleged negligence may have been discovered during the audit, the potential liability could not amount to actual harm until the date of the deficiency assessment or finality of the audit process. While the withdrawal of the settlement offer and the reduction of the plaintiffs' line of credit may represent "palpable harm" caused by the negligence of the defendants, they are based on a tentative assessment of potential tax liability only. This does not amount to actual harm until the date of the deficiency tax assessment or finality of the audit process. The *Feddersen* court noted that its rule

> "both conserves judicial resources and avoids forcing the client to sue the allegedly negligent accountant for malpractice while the audit is pending. It also avoids requiring the client to allege facts in the negligence action that could be used against him or her in the audit, without first allowing the accountant to correct the error (or mitigate the consequences thereof) during the audit process." *Feddersen*, 888 P.2d at 1287.

¶ 31     The appellate court in *Federated* noted that sound policy reasons supported the

-11-

*Feddersen* approach, including creating a bright-line rule, judicial economy, and preservation of the accountant-client relationship. As the appellate court noted here, however, *Federated* did not adopt *Feddersen*'s determination that the trigger for the running of the statute of limitations is the assessment of a deficiency by the IRS. Rather, *Federated* held that the limitations period begins to run when the IRS issues a notice of deficiency or when the taxpayer agrees with the IRS's proposed adjustments. *Federated*, 402 Ill. App. 3d at 36.

¶ 32    The appellate court in the instant case adopted the *Feddersen* approach, concluding that for purposes of an accounting malpractice case involving increased tax liability, the taxpayer suffers actual harm upon the earliest of two events: (1) the IRS makes a deficiency assessment or (2) the taxpayer agrees with the IRS to pay additional taxes, penalties, or interest for which the taxpayer would not have been liable but for the accountant's negligence. 408 Ill. App. 3d at 602.

¶ 33    The Deutsche defendants argue that the policy reasons underlying the *Federated* and *Feddersen* decisions are meaningless in the intentional fraud context, noting that justifications such as preserving the accountant-client relationship and encouraging clients to seek assistance from their accountants in sorting out their tax difficulties do not apply where the client has alleged that a party to a transaction committed intentional fraud at the time of the transaction. In addition, the Deutsche defendants note that plaintiffs did not contact Deutsche Bank at any point after the 2000 COINS Strategy was completed.

¶ 34    While it may be true that not all of the policy reasons identified by *Federated* and *Feddersen* would apply to this case because the Deutsche defendants were not acting as accountants, we believe the proper focus should be on the nature of the harm allegedly caused, not on the status of the parties. Here, although plaintiffs alleged that they suffered injury by paying fees to Deutsche Bank, they also alleged that the major benefit promised to them by the Deutsche defendants and their alleged coconspirators in persuading them to participate in the tax-reducing investment strategies was that they would be able to deduct losses on their income tax returns regardless of whether they made any profit on the investment strategy transactions. The factual allegations of the complaint make clear that the essence of the investment strategies was to provide plaintiffs with a tax benefit, not to make a profit. In addition, we note that, in its motion to dismiss in the trial court, Deutsche Bank itself emphasized the fact that plaintiffs "implemented a series of tax shelters (three in as many years) to avoid tax liabilities in 1999, 2000 and 2001." Deutsche Bank alleged that "Shahid Khan made calculated, informed decisions to execute transactions in the hope that by doing so, he might be able to shelter huge amounts of income." Thus, Deutsche Bank recognized that the main purpose of engaging in the investment strategies was to shelter the Khans' income from taxation. To this end, the Deutsche defendants arranged for a legal opinion from Jenkens & Gilchrist purporting to confirm to plaintiffs that the tax-reducing investment strategies were legitimate and would allow plaintiffs to claim losses on their tax returns. Plaintiffs alleged that in furtherance of the fraudulent scheme, they were advised not to participate in the IRS amnesty programs and were assured that the investment strategies were not the kinds of tax shelters described by the IRS as lacking in economic substance. Thus, it is clear from the factual allegations of plaintiffs' complaint that the primary benefit

plaintiffs sought from the investment strategies was the purported tax benefits. That defendants were not professional accountants is not determinative of the analysis to be used here.

¶ 35    Deutsche Bank argues that the *Federated* decision conflicts with the appellate court's decision in *SK Partners I, LP v. Metro Consultants, Inc.*, 408 Ill. App. 3d 127 (2011), an accounting malpractice case. The plaintiffs there overpaid their taxes due to errors made by the defendant accountants. The IRS conducted an audit and issued refund checks. Nearly two years later, the plaintiffs filed their lawsuit alleging negligence in the preparation of their tax returns by failing to claim a proper depreciation deduction. The trial court granted the defendants' motion to dismiss on statute of limitations grounds. The appellate court affirmed, holding that actual damages occurred at the moment taxes were overpaid and the plaintiffs were deprived of funds they were rightfully entitled to retain. The limitations period began to run when their injury was discovered by another accountant. The court distinguished *Federated* because there the plaintiffs suffered no damages until the IRS audit revealed an underpayment of taxes and a deficiency assessment was made. *Id.* at 131-32. According to the Deutsche defendants, *SK Partners* makes clear that tort claims generally accrue when the defendant's alleged breach first causes the plaintiff harm and the statutory limitations period does not toll merely because the IRS is involved. We discern no conflict between *SK Partners* and *Federated*. *SK Partners* actually used *Federated*'s analysis in determining that actual damages accrued when the taxes were overpaid, although it acknowledged that the rule in *Federated* did not readily apply to overpayment of taxes. *Id.* at 131.

¶ 36    Deutsche Bank argues that the appellate court's decision runs counter to the majority of courts that have considered the issue. It cites primarily federal district cases in which the trial courts there found the limitations period began to run much earlier in similar situations. At the outset, we note that cases from the federal trial courts lack significant precedential weight. See *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 263 (2005). Nonetheless, Deutsche Bank cites *Hutton v. Deutsche Bank AG*, 541 F. Supp. 2d 1166 (D. Kan. 2008), where the plaintiff brought a class action against investment advisors for allegedly misrepresenting the nature of investment strategies as legal tax shelters. The defendants filed motions to dismiss on statute of limitations grounds. The district court granted the motions. It rejected the plaintiff's argument that the statute of limitations had not started to run because he was still litigating his tax-shelter claim in the court of federal claims. The district court noted that other courts had found allegations similar to the plaintiff's sufficient to start the running of the limitations period, such as fees paid to the defendants, losses incurred in the investment transactions, and expenses paid to accountants and attorneys to assist in the defense of audits, as well as taxes and penalties paid. The *Hutton* court found that the plaintiff's similar allegations alleged immediate and definite injury sufficient to commence the limitations period. *Id.* at 1172-73.

¶ 37    Deutsche Bank also cites *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447 (S.D.N.Y. 2009), a case concerning allegedly fraudulent investment schemes similar to *Hutton* and to the instant case. The trial court in *Kottler* held that the statute of limitations began to run when the IRS audited a prior year's return relative to an investigation of one of the

investment strategies after the plaintiff was informed by his accountant that the IRS was investigating that particular strategy and the plaintiff then disclosed his participation in the investment strategy. The plaintiff received a notice of deficiency detailing the several million dollars the IRS claimed the plaintiff owed on his 1998 return. The trial court rejected the plaintiff's argument that he did not know of the fraud until a Senate subcommittee held hearings and issued its final report on this and other investment schemes. *Id.* at 460-61.

¶ 38    In *Moorehead v. Deutsche Bank AG*, 2011 WL 4496221 (N.D. Ill. 2011), another case cited by the Deutsche defendants that is similar in many respects to the instant case, the plaintiffs were offered the opportunity to invest in tax-reducing strategies called OPIS and BLIPS. The sales pitch made by the defendants to the plaintiffs were similar to the ones made here. The IRS published a series of public notices stating that losses from the OPIS and BLIPS strategies were not allowable and that the transactions were fraudulent and illegal. The IRS also issued formal settlement offers for both the OPIS and BLIPS strategies, offering to forgo penalties and allow affected taxpayers to recognize some amount of their capital losses. The IRS audited the plaintiffs' returns and issued a notice of deficiency. Nearly two years later, the plaintiffs filed suit. The defendants filed a motion to dismiss on statute of limitations grounds. The district court applied the law of Texas to the limitations issue. The court held that under Texas law, the plaintiffs suffered legal injury when the faulty professional advice was given. However, the discovery rule postponed accrual until the plaintiff knows or in the exercise of ordinary diligence should know of the wrongful act and resulting injury. The district court rejected the plaintiffs' argument that they suffered no cognizable injury until the IRS assessed back taxes and penalties against them. The court noted that the plaintiffs alleged in their complaint that the IRS was auditing their tax returns and that despite this knowledge and the knowledge of the IRS settlement offers on the OPIS and BLIPS strategies, the defendants failed to advise the plaintiffs to enter into the settlement offers. The district court regarded these allegations as admissions by the plaintiffs that the notices of audit they received related specifically to the investment strategies. This fact, together with the IRS notices and settlement offers was sufficient to put the plaintiffs on notice of a claim for fraudulent tax advice and the statute of limitations began to run at that point. *Id.* at * 6-8.

¶ 39    In *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363 (S.D.N.Y. 2004), a case similar to the case at bar, the plaintiffs alleged they were defrauded into investing in illegal tax shelters. The defendants sought dismissal of the complaint on statute of limitations grounds. Deutsche Bank, one of the defendants, argued that the plaintiffs' claims were not ripe because there had been no final resolution of their dispute with the IRS and state taxing authorities. The district court rejected that argument, citing losses incurred by the plaintiffs, including fees paid to the defendants, expenses incurred in defending tax audits, and tax penalties already assessed and paid. *Id.* at 371.

¶ 40    We do not find these cases to be persuasive. In *Hutton*, the taxpayer had already paid taxes and penalties related to the illegal tax shelter, as well as other expenses to defend against the audits. In *Kottler*, the IRS had audited a prior year's tax return due to an investigation of one of the investment strategies the taxpayer had entered into and his accountant had informed him that the IRS was investigating that strategy. The taxpayer then

elected to disclose his participation to the IRS. In addition, the taxpayer had received a notice of deficiency related to the illegal tax shelter, yet he did not file his complaint until much later. In *Seippel*, tax penalties had already been assessed against the plaintiffs and paid by them before they filed their complaint. *Moorehead* is more supportive of the Deutsche defendants' position than the other cases they cite. We have held, however, that the limitations period began to run in this case when plaintiffs received a notice of deficiency. Thus, we disagree with *Moorehead*'s analysis.

¶ 41　　　Defendant David Parse separately argues that fraud is the gravamen of plaintiffs' complaint based upon representations made to them by Parse and others that the options transactions were legitimate investments with a real expectation of profit when, in fact, the opposite was true. He asserts that plaintiffs were on notice of the alleged fraud in 2003 and that is when the limitations period began to run. However, as plaintiffs argue in their brief, the discovery rule does not apply before an actionable injury has occurred.

> "The discovery rule can delay the commencement of the limitations period where an injury has already occurred but has not been discovered. [Citation.] However, the period of limitations does not commence in the first instance until an injury is incurred. [Citation.] Where no injury has yet occurred, the discovery rule is irrelevant because there is nothing to discover." *MC Baldwin Financial Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill. App. 3d 6, 22 (2006).

¶ 42　　　As of May 2003, no injury had occurred. Plaintiffs had filed their tax returns and claimed tax losses based on the options transactions. At that point, they had received the promised tax benefits. Further, plaintiffs alleged in their complaint that they had been assured by some of the alleged coconspirators that the IRS notices did not apply to them. Parse is alleged to be one of the coconspirators.

¶ 43　　　Parse further argues that the limitations period begins to run when the plaintiff has a remedy. He notes that plaintiffs included in their complaint a count seeking rescission and a count seeking declaratory judgment that the contracts entered into in connection with the investment transactions are unenforceable due to a lack of consideration. Parse's view is that these remedies were available to plaintiffs in May 2003 when, according to Parse, plaintiffs knew that the IRS had declared similar options transactions a sham. We reject this argument. The main purpose of entering into the options transactions was to provide plaintiffs with a tax benefit in the form of a legal tax shelter. While plaintiffs initially received the benefit of claiming tax losses on their tax returns, the IRS subsequently disallowed the losses and proposed to assess plaintiffs with back taxes, penalties, and interest. Once the tax returns were filed and the losses claimed, rescission and a declaratory judgment would not have provided plaintiffs with any real remedy.

¶ 44　　　It remains to determine whether the statute of limitations begins to run when the IRS issues a notice of deficiency or when the IRS makes an assessment. The appellate court here held that the statute of limitations begins to run at the earlier of (1) an assessment by the IRS or (2) the taxpayer's settlement agreement with the IRS. The court found that it was at this point that the taxpayer suffers actual harm. The appellate court in *Federated* purported to follow the *Feddersen* decision from California; however, *Feddersen* held that the statute begins to run when an assessment is made by the IRS, while *Federated* chose the notice of

deficiency as the earliest event that would trigger the running of the limitations period. *Federated* noted that a majority of jurisdictions in decisions preceding *Feddersen* had held that the limitations period commences when there is a formal assessment of a deficiency by the taxing authority. *Federated*, 402 Ill. App. 3d at 35.

¶ 45    We conclude that the limitations period begins to run when the IRS issues a notice of deficiency to the taxpayer. The notice of deficiency "describe[s] the basis for, and identif[ies] the amounts (if any) of, the tax due, interest, additional amounts, additions to the tax, and assessable penalties included in such notice." 26 U.S.C. § 7522(a) (2006). Receipt of the notice of deficiency puts the taxpayer on notice that he has suffered an injury and that the injury was wrongfully caused. The notice of deficiency is not a final determination of the taxpayer's damages; the formal assessment made by the IRS constitutes the final determination of the taxpayer's liability. It is at this latter point that the taxpayer is fully informed as to the full extent of his injuries. As we have stated, however, the discovery rule applies in this case. Under that rule, a plaintiff may not sit on his rights, but must investigate further once alerted to an injury that may have been caused by wrongful conduct. As previously noted, this court has "never suggested that plaintiffs must know the full extent of their injuries before the statute of limitations is triggered. Rather, our cases adhere to the general rule that the limitations period commences when the plaintiff is injured, rather than when the plaintiff realizes the consequences of the injury or the full extent of her injuries." *Golla*, 167 Ill. 2d at 364. To permit plaintiffs to wait until the full extent of their injuries are known would read the discovery rule out of this case. Starting the limitations period at the issuance of the notice of deficiency gives plaintiffs a five-year window within which to file suit. Thus, even if the IRS has not yet issued a formal deficiency assessment against plaintiffs in this case, their action is timely.

¶ 46                                    II. Breach of Fiduciary Duty

¶ 47    The Deutsche defendants filed a section 2-615 motion seeking to dismiss count I of plaintiffs' complaint, alleging breach of fiduciary duty. The trial court granted the motion. A section 2-615 motion to dismiss challenges the legal sufficiency of the complaint based upon defects apparent on its face. Accordingly, we review *de novo* the trial court's order granting defendants' motion. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). In reviewing the sufficiency of a complaint, we accept as true all well-pleaded facts in the complaint and all reasonable inferences that may be drawn therefrom. In addition, we construe the allegations of the complaint in the light most favorable to the plaintiff. Only those facts apparent from the face of the pleadings, matters of which the court can take judicial notice, and judicial admissions in the record may be considered. *K. Miller Construction Co. v. McGinnis*, 238 Ill. 2d 284, 291 (2010). A cause of action should not be dismissed unless it is clearly apparent that no set of facts can be proved that would entitle a plaintiff to recover. *Marshall*, 222 Ill. 2d at 429.

¶ 48    In count I of their complaint, plaintiffs alleged that they placed their trust and confidence in defendants and that defendants had influence and superiority over plaintiffs; thus defendants owed plaintiffs the duties of honesty, loyalty, and care. In addition, plaintiffs incorporated their numerous factual allegations into count I. They alleged that defendants

breached their fiduciary duty to plaintiffs by (1) advising plaintiffs to engage in the investment strategies; (2) failing to advise plaintiffs that the legal opinions were not independent and, as a result, could not provide the required legal support or penalty protection; (3) advising plaintiffs that they could make a profit on the 1999 Digital Options Strategy contracts and the options; (4) orchestrating the implementation of the investment strategies; (5) providing the purported required legal opinion letters verifying that the investment strategies were completely legal; (6) failing to advise plaintiffs that certain defendants and/or other participants had undisclosed fee-splitting or sharing arrangements; and (7) advising plaintiffs to sign and file their tax returns in reliance on defendants' advice, representations, recommendations, instructions, and opinions, which defendants knew or should have known the IRS would conclude were improper and illegal, for the purpose of generating huge fees for defendants.

¶ 49    Initially, we bear in mind that we are not determining whether a fiduciary relationship actually existed between the Deutsche defendants and plaintiffs. That matter must be left for further proceedings on remand. We determine only whether the well-pleaded factual allegations of the complaint adequately alleged that a fiduciary relationship existed and was breached by the Deutsche defendants. In making this determination, we are limited to the factual allegations of the complaint and reasonable inferences drawn therefrom. We may not consider extraneous matters. As this court stated in *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469 (1994):

> "A motion to dismiss under section 2-615 attacks only the legal sufficiency of a complaint. Such a motion does not raise affirmative factual defenses, but alleges only defects appearing on the face of the complaint. [Citations.] A section 2-615 motion is required to point out the defects complained of and must specify the relief sought. [Citation.] The only matters to be considered in ruling on such a motion are the allegations of the pleadings themselves." *Id.* at 484-85.

¶ 50    Here, the Deutsche defendants filed a combined motion to dismiss the fiduciary duty count of the complaint on the basis of section 2-615 and to dismiss the entire complaint on statute of limitations grounds pursuant to section 2-619. In the section 2-615 section of the motion to dismiss, the Deutsche defendants referred to an affidavit of Michael R. Wanser, one of the attorneys for Deutsche Bank, which verified the accuracy of exhibits attached to the motion. Those exhibits included confirmations for the 1999 Digital Options Strategy and the 2000 COINS Strategy transactions and the account agreements entered into by the parties. The confirmations contained the following language:

> "3. Representations
>
> Each party represents to the other party that it is entering into this Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise) and that
>
> (i) It has sufficient knowledge and experience to be able to evaluate the appropriateness, merits and risks of entering into this Transaction and is acting in reliance upon its own judgment or upon professional advice it has obtained independently of the other party as to the appropriateness, merits and risks of so doing, including where relevant, upon its own judgment of the correct tax and

accounting treatment of such Transaction;

　　(ii) It is not relying upon the views or advice of the other party (including, without limitation, any marketing materials or model data) with respect to this Transaction; and

　　(iii) It acknowledges that, with respect to this Transaction, the other party is acting solely in the capacity of an arm's length contractual counterpart and not in the capacity of financial adviser or fiduciary."

¶ 51　　The Deutsche defendants argued in their motion that the allegations of the complaint were contradicted by the terms of the contractual documents and that plaintiffs had disclaimed any reliance on advice from the Deutsche defendants, thereby negating the existence of a fiduciary relationship. The appellate court noted the impropriety of considering the contractual documents in connection with the section 2-615 motion to dismiss. Nonetheless, the court found that plaintiffs had forfeited any argument that the trial court's consideration of the affidavit and exhibits was improper by making substantive arguments, rather than by relying on a procedural objection to consideration of the documents. 408 Ill. App. 3d at 579-80. We disagree with the appellate court's conclusion.

¶ 52　　The appellate court recognized that the affidavit and exhibits attached to the Deutsche defendants' motion to dismiss could not negate the well-pleaded facts of the complaint. The court further noted that the contractual documents were not attached to plaintiffs' complaint and that, even if they were, the documents could only trump the allegations in the complaint if the complaint were founded on the documents. The court observed that plaintiffs' claim for breach of fiduciary duty was not founded upon the contractual documents. *Id.* at 580. In support, the appellate court cited this court's decision in *Armstrong v. Guigler*, 174 Ill. 2d 281 (1996), where the question before the court was whether the 10-year statute of limitations for actions on a written contract or the five-year statute of limitations for all civil actions not otherwise provided for applied to a cause of action for breach of an implied fiduciary duty. The appellate court in that case had held that the implied duty was created in a written document and, therefore, the 10-year limitations period applied. This court reversed, holding that the five-year statute applied. Pertinent to the issue in the instant case, the court noted that a fiduciary duty is not expressed in a written contract, but is implied in law. *Id.* at 287. A breach of an implied fiduciary duty is not an action on a contract simply because the duty arises by legal implication from the parties' relationship under a written agreement. A fiduciary duty is founded upon the substantive principles of agency, contract, and equity. *Id.* at 293-94.

¶ 53　　Based upon this reasoning, the appellate court concluded that since plaintiffs' action for breach of fiduciary duty is not founded on the contractual documents, those documents do not override the factual allegations of the complaint. Accordingly, the appellate court declared that it would take all of the well-pleaded facts of the complaint as true even if the disclaimer in the contractual documents appeared to contradict those factual allegations. 408 Ill. App. 3d at 580-81.

¶ 54　　We agree with the appellate court that the contractual documents appended as exhibits to the motion to dismiss are not properly considered under the standard of review for a section 2-615 motion to dismiss. We disagree, however, with the appellate court's

conclusion that plaintiffs forfeited any argument that the documents were improperly considered by the trial court. The appellate court acknowledged that plaintiffs argued on appeal that "notwithstanding Wanser's affidavit, [the court] should 'accept as true all well-pleaded facts in the complaint and all reasonable inferences which can be drawn therefrom' and that [the court] should 'interpret the allegations of the complaint in the light most favorable to the plaintiffs.' " *Id.* at 580. This argument urged the appellate court to apply the accepted standard of review in evaluating the merits of the Deutsche defendants' section 2-615 motion to dismiss. Thus, plaintiffs did in fact argue that consideration of the Wanser affidavit and the contractual documents was improper under the applicable standard of review. Any substantive arguments plaintiffs made concerning the content and effect of the contractual documents can properly be seen not as a concession to the applicability of the documents but as an argument that was necessary due to the trial court's consideration of the contractual documents. Thus, contrary to the appellate court, we find that plaintiffs did not forfeit their argument that the contractual documents should not be considered.

¶ 55    A further reason not to go beyond the face of the complaint here is that plaintiffs point out what they perceive to be conflicts between the transaction confirmations and the account agreements regarding the alleged disclaimer of any fiduciary relationship between the parties with respect to the options transactions. The account agreements were entered into at the inception of the parties' relationship and plaintiffs assert that these agreements contain no disclaimer of a fiduciary relationship. In contrast, the confirmations were signed following the completion of the options transactions. Plaintiffs assert that these conflicts illustrate the difficulties inherent in attempting to definitively resolve the existence of a fiduciary relationship at the pleading stage, especially where the defendant relies on factual material outside the pleadings to defeat the complaint's allegations. Plaintiffs argue that the import and weight, if any, to be given to the contractual documents should be determined only after discovery and the development of a proper evidentiary record. In addition to this consideration, we note that plaintiffs have alleged that the Deutsche defendants fraudulently misrepresented the nature of the tax-reducing investment strategies in an attempt to induce plaintiffs to enter into the transactions at issue. To the extent that these allegations, if proven, would have any effect on the nature of the parties' relationship, it would be premature to determine the effect of the disclaimers on plaintiffs' allegations of the existence of a fiduciary relationship.

¶ 56    The standard of review on a section 2-615 motion to dismiss clearly limits our review to the face of the complaint. In contrast, on a motion for summary judgment, courts consider the pleadings, depositions and admissions on file, together with affidavits, if any. *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 308 (2010). Consideration of the contractual documents attached to the Deutsche defendants' motion would essentially convert their section 2-615 motion to dismiss into a motion for summary judgment. We decline to take this step. In addition, we agree with plaintiffs' argument that to consider matters outside the pleadings would inappropriately resolve issues that are best resolved on remand with the benefit of a full evidentiary record. For all of these reasons, we decline to address the effect of the alleged disclaimers in the contractual documents at this stage of the proceedings. Therefore, we will confine our review to the well-pleaded factual allegations in plaintiffs' complaint, together with reasonable inferences to be taken therefrom.

¶ 57 The Deutsche defendants alleged in the appellate court that New York law applied to the fiduciary duty issue because the contractual documents attached to Wanser's affidavit provided that New York law would apply to the construction of the account agreements and the transaction confirmations. The appellate court determined that it would apply New York law "insomuch as this case requires us to interpret and apply exhibits A through C [the contractual documents] of Wanser's affidavit." 408 Ill. App. 3d at 581. We need not address this question. As we have indicated, the contractual documents are not properly part of our analysis on the section 2-615 issue. Resolution of the effect of the documents on plaintiffs' claim for breach of fiduciary duty must await further proceedings in the circuit court.

¶ 58 A fiduciary relationship exists where one party reposes trust and confidence in another, who thereby gains a resulting influence and a superiority over the subservient party. This is generally accomplished by establishing facts showing an antecedent relationship that gives rise to trust and confidence reposed in another. *Ray v. Winter*, 67 Ill. 2d 296, 304 (1977). The question is whether plaintiffs have sufficiently alleged facts establishing such a relationship.

¶ 59 Deutsche Bank argues that no fiduciary duty existed in this case. It describes Khan as a sophisticated businessman and characterizes its relationship with him as an isolated and adversarial financial transaction made at arm's length based upon a single telephone call between Khan and Parse prior to either party agreeing to enter into any relationship or transaction. The complaint, however, alleges that Khan was unknowledgeable and unsophisticated concerning tax laws and tax-advantaged investment strategies and that he relied on the Deutsche defendants for comprehensive legal, accounting, tax, and investment advice. Plaintiffs further alleged that Khan was persuaded to invest in the tax-reducing investment strategies after a series of telephone conferences with defendant Parse, not just a single telephone call, as Deutsche Bank claims. According to plaintiffs, Parse, who was Deutsche Bank's employee, assured Khan that (1) the options transactions were actual, legitimate investments; (2) Deutsche Bank would handle all aspects of the transaction, (3) Parse was the expert and would make all decisions concerning the digital options transactions, (4) Deutsche Bank had internal procedures that would determine the right types of investments to make, (5) the tax-reducing investment strategies would produce legal tax losses for plaintiffs, and (6) plaintiffs would have a good chance of making a profit on the investments. The complaint alleged that plaintiffs decided to participate in the tax-reducing investment strategies based upon the Deutsche defendants' assurances, and that the Deutsche defendants knew that plaintiffs reposed "tremendous trust and faith" in them as their tax, financial, and investment advisors with respect to all aspects of the tax-reducing investment strategies.

¶ 60 We find that these allegations adequately pleaded that the Deutsche defendants had superior knowledge and influence over Khan and that he relied on them to give him sound investment and tax advice. It is undisputed that the Deutsche defendants had complete control over the handling and the outcome of the transactions. In addition, we note that the Deutsche defendants do not argue that the factual allegations of the complaint are inadequate to plead the existence of a fiduciary relationship between them and plaintiffs. Instead, they take issue with the accuracy of the complaint's factual allegations and focus their argument on their view that the transactions at issue here were arm's-length transactions entered into

by parties who were on equal footing and that, in any event, any fiduciary relationship was disclaimed by plaintiffs in the contractual documents. Deutsche Bank places great emphasis on its claim that there was but a single telephone call between Khan and Parse and that this is insufficient to establish a fiduciary relationship. However, as we have stated, the complaint alleges a series of telephone conferences among the parties. We note again that in reviewing an order granting a section 2-615 motion to dismiss, we must take the well-pleaded factual allegations of the complaint as true. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305 (2008).

¶ 61 The appellate court found that the Deutsche defendants had a preagency fiduciary duty to Khan that predated the existence of the disclaimers in the transaction confirmations, pursuant to this court's decision in *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33 (1994). The Deutsche defendants argue that the appellate court misapplied *Martin* in finding that a fiduciary duty arose between the parties as a matter of law. The appellate court found it necessary to address this issue because of the possible effect of the contractual disclaimers. However, we have concluded that the contractual documents may not be considered on a section 2-615 motion to dismiss. Therefore, it is unnecessary for us to discuss *Martin* or the question of whether a preagency fiduciary duty existed in this case.

¶ 62 Thus, we conclude that the trial court improperly granted the Deutsche defendants' section 2-615 motion to dismiss plaintiffs' claim of breach of fiduciary duty.

¶ 63 III. Negligent Misrepresentation

¶ 64 The trial court determined that no fiduciary relationship existed between the parties and that this conclusion was sufficient to dismiss plaintiffs' claim for negligent misrepresentation against the Deutsche defendants. We have determined that plaintiffs adequately pleaded a cause of action for breach of fiduciary duty based upon the well-pleaded factual allegations of the complaint and that the contractual documents that were the basis for the trial court's dismissal of the fiduciary duty claims were improperly considered by that court. Thus, the trial court's order dismissing the count for negligent misrepresentation on this basis was erroneous. The appellate court concluded that plaintiffs had adequately pleaded a cause of action for negligent misrepresentation. Plaintiffs alleged that they suffered pecuniary injury by relying on false information that the Deutsche defendants negligently or fraudulently gave them in the course of their business. We note that defendants do not argue that the factual allegations of negligent misrepresentation are insufficient to state a claim. Thus, they have forfeited any argument to that effect. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). In fact, the Deutsche defendants did not raise any issue regarding plaintiffs' claim for negligent misrepresentation in their petitions for leave to appeal. For this additional reason, we find that the Deutsche defendants have forfeited any review of the appellate court's findings concerning plaintiffs' claim for negligent misrepresentation. See *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 320-21 (2008).

¶ 65 IV. Grant Thornton, LLP

-21-

¶ 66 Plaintiffs allege in their complaint that Grant Thornton participated in the alleged conspiracy with BDO Seidman and the Deutsche defendants. Grant Thornton, a public accounting firm, rendered services to Thermosphere FX by preparing its 2000 federal and state income tax returns. These tax returns claimed the artificial losses created by the 2000 COINS Strategy investment. These losses then flowed through to the Khans as partners. Thus, the Khans' individual returns contained the losses from the 2000 COINS Strategy.

¶ 67 The trial court dismissed plaintiffs' claims against Grant Thornton on statute of limitations grounds. The court held that the five-year statute of repose applicable to actions against public accountants barred those claims.

¶ 68 The statute of limitations that applies to plaintiffs' claims against Grant Thornton is contained in section 13-214.2 of the Code (735 ILCS 5/13-214.2 (West 2008)). That statute provides in relevant part as follows:

> "(a) Actions based upon tort, contract or otherwise against any person, partnership or corporation registered pursuant to the Illinois Public Accounting Act, as amended, or any of its employees, partners, members, officers or shareholders, for an act or omission in the performance of professional services shall be commenced within 2 years from the time the person bringing an action knew or should reasonably have known of such act or omission.
>
> (b) In no event shall such action be brought more than 5 years after the date on which occurred the act or omission alleged in such action to have been the cause of the injury to the person bringing such action against a public accountant. Provided, however, that in the event that an income tax assessment is made or criminal prosecution is brought against a person, that person may bring an action against the public accountant who prepared the tax return within two years from the date of the assessment or conclusion of the prosecution." 735 ILCS 5/13-214.2 (West 2008).

¶ 69 The interpretation of a statute is a question of law that this court reviews *de novo*. *People v. Smith*, 236 Ill. 2d 162, 167 (2010). The primary goal in construing a statute is to give effect to the intention of the legislature. The statute's language must be given its plain and ordinary meaning. When statutory terms are left undefined, we presume the legislature intended the terms to have their popularly understood meaning. *Id.* at 166-67.

¶ 70 Grant Thornton first argues that plaintiffs' complaint alleges they suffered an injury when their investments were made and they paid substantial fees to Deutsche Bank. Grant Thornton also notes that plaintiffs hired tax counsel in 2003 to represent them in litigation with the IRS and it argues that the statute of limitations began to run at one of these points. These are the same arguments made by Deutsche Bank and Parse, which we have previously rejected. We reject Grant Thornton's arguments for the same reasons.

¶ 71 Grant Thornton attempts to avoid the application of *Federated* and *Feddersen* by citing two cases that refused to apply *Feddersen* to an action against an accountant, *Apple Valley Unified School District v. Vavrinek, Trine, Day & Co.*, 120 Cal. Rptr. 2d 629 (Cal. Ct. App. 2002), and *Van Dyke v. Dunker & Aced*, 53 Cal. Rptr. 2d 862 (Cal. Ct. App. 1996). Neither of these cases involved preparation of tax returns and subsequent IRS proceedings. In *Apple Valley*, the accountants prepared an audit report that induced the plaintiff school district to provide state funds to a charter school district that was not eligible for the funds. The school

district learned of the wrongdoing and hired counsel and a different accountant. More than two years later, the school district filed suit against the defendant accountant during the pendency of the state comptroller's audit, which ultimately determined that the charter school had received several million dollars in funds to which it was not entitled. The school district argued that the statute of limitations did not begin to run until the comptroller's final report determined the amount of the school district's liability. The California appellate court disagreed, holding that the school district first sustained an injury when it learned of the improper conduct and incurred expenses to investigate the extent of the alleged wrongdoing. The court found that *Feddersen* did not apply, noting that subsequent decisions had given the holding of *Feddersen* a narrow application limited to the context of negligent preparation of tax returns. *Apple Valley*, 120 Cal. Rptr. 2d at 636-38.

¶ 72    Similarly, the *Van Dyke* court found *Feddersen* inapplicable. The plaintiffs there made a charitable contribution of land based on their accountant's advice that they would receive a tax deduction for the full value. In reality, they were entitled to a partial deduction, which they then claimed on their tax return. They filed suit against the accountant after the IRS determined their final tax liability. The *Van Dyke* court found *Feddersen* to be limited to the negligent preparation of tax returns. The court noted that the plaintiffs suffered an actual injury before the IRS determined their tax liability when they conveyed the land or when they paid more taxes than they had expected to pay by receiving only a partial deduction. *Van Dyke*, 53 Cal. Rptr. 2d at 868-69. *Apple Valley* and *Van Dyke* involve factual situations that are quite different from the one before us. Grant Thornton's reliance on these two cases is misplaced.

¶ 73    Grant Thornton argues in the alternative that even if plaintiffs' action against it is not barred by the two-year limitations period contained in section 13-214.2, their action is barred by the five-year repose period contained in the statute. The preparation of the Thermosphere returns by Grant Thornton took place in 2001. Thus, the period of repose expired in 2006. Plaintiffs filed suit in 2009, more than five years after the returns were prepared. Plaintiffs note the exception to the repose period contained in the statute which provides that in the event an income tax assessment is made or criminal prosecution is brought against a person, that person may bring an action against the public accountant who prepared the tax return within two years from the date of the assessment or conclusion of the prosecution. Grant Thornton argues that, rather than extending the period of repose, the exception contained in the statute condenses the repose period. This was the construction put on the exception by the circuit court and rejected by the appellate court. The latter court found it significant that the exception provides that the plaintiff "may" bring the action, rather than "shall" bring the action. According to the appellate court, the word "may" indicates that the plaintiff has permission to bring the action and such permission would be necessary only if the five-year repose period had expired. Grant Thornton takes issue with this reasoning, arguing that, here, the term "may" is synonymous with "shall." It argues that plaintiffs had knowledge of the relevant facts giving rise to their action at least six years before they filed their lawsuit. Thus, according to Grant Thornton, this case does not present the circumstance envisioned by the statute of a taxpayer being blind sided by an assessment. We note that Grant Thornton cites no authority for its claim that the legislature intended the exception to the repose period to apply only in those circumstances.

¶ 74    We reject Grant Thornton's reading of the exception in the statute. If "may" is construed to mean "shall," there would be no need for the proviso in the first instance. An assessment fixes the taxpayer's liability and the amount of the assessment becomes a lien on the taxpayer's property. 26 U.S.C. § 6321. Certainly, once an assessment is made, the taxpayer knows full well that he has been injured and that the injury was wrongfully caused and the limitations period would begin to run at that point in any event. The only reading that gives the proviso meaning is that it is a true exception to the repose period and that in the circumstances envisioned by that exception, the taxpayer has an additional two years beyond the five-year repose period to bring an action against the accountant from the date of the assessment or the conclusion of the criminal prosecution.

¶ 75    Grant Thornton further argues that the two-year exception does not apply here in any event because there has been neither an income tax assessment nor a criminal prosecution. Grant Thornton asserts that the term "income tax assessment" in the statute refers to a formal assessment made by the IRS and notes that the record does not indicate that a tax assessment has been made against any plaintiff. Rather, they have received only a notice of deficiency. Grant Thornton cites no authority in support of its argument that the phrase "income tax assessment" refers only to a formal IRS assessment of tax. The phrase is not defined in the statute. Where a term is undefined, we presume that the legislature intended the term to have its popularly understood meaning. *People v. Maggette*, 195 Ill. 2d 336, 349 (2001). We note that Black's Law Dictionary provides a definition for "deficiency assessment," defining that term as "[a]n assessment by the IRS—after administrative review and tax-court adjudication—of additional tax owed by a taxpayer who underpaid." Black's Law Dictionary 133 (9th ed. 2009). This definition would comport with Grant Thornton's view; however, the legislature did not use "deficiency assessment" in the statute.

¶ 76    It is appropriate to employ a dictionary to ascertain the meaning of an otherwise undefined word or phrase. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 8 (2009). The dictionary definition of "assessment" relevant to this case is "a specific charge or tax determined upon by assessing : amount assessed." The word "assess" is defined as "to determine the rate or amount of (as a tax, charge, or fine)." Webster's Third New International Dictionary 131 (2002). Plaintiffs argue that the statutory phrase encompasses the determination of tax liability made by the IRS here in its notice of deficiency. However, the notice of deficiency is not a final determination of tax liability. That determination comes only with the tax assessment made by the IRS. The notice of deficiency is a preliminary determination by the IRS of tax liability that may change once the assessment proceeding has run its course. In light of these factors and the dictionary definition of "assessment," we agree with Grant Thornton that the two-year extension of the statute of repose contained in section 13-214.2 begins to run when the IRS makes a final assessment of taxes owed by the taxpayer. We also agree, however, with the appellate court that in the event an assessment is not made due to a settlement entered into between the taxpayer and the IRS, the two-year extension would begin to run from the date of the settlement. It would be incongruous to allow a taxpayer who received an assessment to take advantage of the two-year extension, but deny that privilege to a taxpayer who settled with the IRS prior to an assessment. Interpreting the statute otherwise would lead to an unjust and unreasonable outcome, something courts should avoid doing whenever possible. See *Roselle Police Pension Board*

*v. Village of Roselle*, 232 Ill. 2d 546, 558-59 (2009).

¶ 77   Grant Thornton asserts that the record does not show that the IRS has yet made an assessment in plaintiffs' case. Plaintiffs do not dispute this contention but instead they argue that to the extent there is a factual issue concerning whether an assessment has been made, that issue should be considered on remand. We agree with plaintiffs that this is a question of fact that may not be decided under the current posture of this case. The trial court did not make that determination because it held that the proviso in the statute did not extend the period of repose beyond five years. Therefore, on remand, the trial court may determine whether an assessment has in fact been made. If an assessment has not been made, the trial court may entertain whatever motions it deems appropriate.

¶ 78   Grant Thornton also argues that the proviso in the statute is inapplicable because Grant Thornton prepared tax returns for Thermosphere, which did not receive any notice of tax deficiency from the IRS. Plaintiffs respond, however, that Thermosphere did in fact receive a formal notice from the IRS of intent to disallow the tax losses claimed on its return. Grant Thornton also notes that any assessment made by the IRS will be against the Khans on their tax returns and it argues that it did not prepare the Khans' returns. Thus, the proviso in the repose period should not be applied to Grant Thornton's preparation of the Thermosphere returns. The appellate court rejected this argument, noting that the legislature must have been aware that negligent preparation of a partnership tax return can cause the individual partners' returns to be incorrect and result in assessment proceedings against the partners. The court concluded that because the statute says "the tax return," rather than "the person's tax return," it does not matter that the tax return prepared was not that of the Khans. Here, the tax losses claimed on Thermosphere's return flowed through to the Khans as partners. To agree with Grant Thornton's position would deprive the Khans and others like them of the two-year extension to the repose period where the accountant who prepared the partnership's returns did not also prepare the individual partners' returns. In construing a statute, we presume that the legislature did not intend absurd, inconvenient, or unjust results. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 280 (2003). We agree with the appellate court that the legislature could not have intended a result that would allow an accountant in this situation to escape liability for the consequences of its negligence because it did not also prepare the partners' tax returns. We therefore reject this argument.

¶ 79   Accordingly, we conclude that the trial court erred in granting Grant Thornton's section 2-619 motion to dismiss.

¶ 80                                    CONCLUSION

¶ 81   For the reasons stated, we affirm the appellate court's judgment.

¶ 82   Appellate court judgment affirmed.

¶ 83   JUSTICE THEIS, concurring in part and dissenting in part:

¶ 84   The majority holds, in pertinent part, that the five-year limitations period, applicable to plaintiffs' various causes of action against the Deutsche defendants (Deutsche Bank AG,

-25-

Deutsche Bank Securities, Inc., and David Parse), did not begin to run until 2008 when plaintiffs received a deficiency notice from the Internal Revenue Service (IRS), and that plaintiffs' complaint, filed in 2009, was therefore timely. *Supra* ¶¶ 17-45. Because this holding cannot be reconciled with our discovery rule, I dissent from this portion of the majority opinion.

¶ 85    The instant litigation arose out of plaintiffs' participation, beginning in 1999, in a series of so-called "investment strategies." Although plaintiffs alleged numerous causes of action, the gravamen of plaintiffs' complaint is that defendants defrauded plaintiffs by marketing and selling investment strategies to them, knowing that, contrary to defendants' representations, plaintiffs' investment would yield no profit (because the investment was rigged) and would not minimize plaintiffs' tax liability (because defendants knew that the IRS had found the same or similar investment strategies illegal). The Deutsche defendants' alleged role in this fraud was confined to the first two investment strategies: the 1999 Digital Options Strategy and the 2000 COINS Strategy. Plaintiffs alleged that, as a consequence of defendants' fraudulent conduct, they suffered the following injuries:

> "(1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the options and digital options and made other investments to effectuate the Investment Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties, and interest, (4) they lost the opportunity to avail themselves [of] other legitimate tax-savings opportunities, (5) they failed to file qualified amended returns, (6) they failed to take part in the Amnesty Program, (7) they failed to take part in the Announcement 2004-46 global settlement initiative, and (8) they have and will continue to incur substantial additional costs to rectify the situation."

¶ 86    The first alleged injury—the payment of significant fees to defendants—figures prominently in plaintiffs' complaint. Plaintiffs alleged that defendants "conspired with one another to design, promote, sell, and implement the Investment Strategies for the purpose of receiving and splitting substantial fees," and that "[t]he receipt of those fees was the primary, if not sole, motive in the development and execution of the Investment Strategies." Plaintiffs sought disgorgement of all payments received by defendants from plaintiffs, and a declaration that defendants have been unjustly enriched and that all fees paid to defendants should be returned to plaintiffs.

¶ 87    In line with these allegations, the Deutsche defendants contend that plaintiffs were first injured in 1999 and 2000 when they paid Deutsche Bank over $1 million in fees in connection with the 1999 Digital Options Strategy and 2000 COINS Strategy. The majority agrees with the Deutsche defendants that "a portion of plaintiffs' injury occurred in 1999 and 2000." *Supra* ¶ 26. Of course, the five-year limitations period applicable to plaintiffs' causes of action did not necessarily commence in 1999. Rather, pursuant to our discovery rule, the limitations period commenced when plaintiffs knew, or reasonably should have known, that this injury occurred and that it was wrongfully caused. See *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 171 (1981). Although plaintiffs alleged that they suffered further injuries beyond the payment of fees, as the majority opinion recognizes, " 'the limitations period commences when the plaintiff is injured, rather than when the plaintiff realizes the

-26-

consequences of the injury or the full extent of [his] injuries.' " *Supra* ¶ 22 (quoting *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 364 (1995)).

¶ 88   Echoing the trial court's ruling, the Deutsche defendants argue that plaintiffs should have known of their injury, and that it was wrongfully caused, no later than May 2003. At that point, plaintiffs were aware that their investment in the 1999 Digital Options Strategy and the 2000 COINS Strategy had yielded no profit; plaintiffs had received audit notices from the IRS in connection with their 1999, 2000, and 2001 tax returns; and plaintiffs had hired independent tax counsel in connection with those audits. According to the Deutsche defendants, plaintiffs' tax counsel should have discovered, through the exercise of due diligence, two IRS notices issued in 1999 and 2000 that clearly disallowed sham investment schemes like the 1999 Digital Options Strategy and the 2000 COINS Strategy.

¶ 89   The import of the two IRS notices is amply set forth in plaintiffs' complaint. Plaintiffs alleged that the "clear message" set forth in IRS Notice 1999-59, issued December 27, 1999, "was that purported losses arising from transactions wholly lacking in 'economic substance' (e.g., the 1999 Digital Options Strategy) are not properly allowable for Federal income tax purposes," and "[a]s a result of Notice 1999-59, the 1999 Strategy Defendants knew or certainly should have known that the IRS would conclude that the purported losses arising from the 1999 Digital Options Strategy were improper and not allowable for tax purposes." Plaintiffs also alleged that IRS Notice 2000-44, issued August 11, 2000, "once again clearly and unequivocally informed accountants, tax attorneys, and financial advisors across the country—and specifically the 1999 Strategy Defendants *** that it believed the 1999 Digital Options Strategy was an illegal and abusive tax shelter." "Most importantly," according to plaintiffs, "Notice 2000-44 specified the precise transaction the 1999 Strategy Defendants marketed and sold to Plaintiffs," and that the "clear message *** was that the IRS would conclude that the purported losses arising from the 1999 Digital Options Strategy are not properly allowable for federal income tax purposes."

¶ 90   Plaintiffs further alleged that IRS Notice 2000-44 "put the 1999 Strategy Defendants *** on notice that the IRS would disallow the 1999 Digital Options Strategy as an illegal and abusive tax shelter and that any taxpayer who filed tax returns using the losses generated from the 1999 Digital Options Strategy would be exposed to penalties." Reiterating its position, plaintiffs alleged that "there is no doubt that the 1999 Strategy Defendants knew or should have known as a result of IRS Notice 1999-59 and 2000-44 *** that the IRS would conclude that the purported losses arising from the Plaintiffs' participation in 1999 Digital Options Strategy were not properly allowable for federal or state income tax purposes and that Plaintiffs would be exposed to substantial penalties if they used the losses generated from the 1999 Digital Options Strategy on their tax returns." Plaintiffs made comparable allegations concerning the import of IRS Notices 1999-59 and 2000-44 with respect to the 2000 COINS Strategy.

¶ 91   In light of these allegations, I agree with the trial court that, pursuant to our discovery rule, the five-year limitations period commenced no later than May 2003. At that point, plaintiffs knew or should have known that the investment strategies the Deutsche defendants helped market and sell were not what defendants allegedly represented them to be, namely, an opportunity to reap "a substantial profit and, at the same time, legally minimize Plaintiffs'

state and federal tax liability." Although plaintiffs may not have realized in May 2003 the full extent of their injuries, they were, at that point, under a burden "to inquire further as to the possible existence of a cause of action." *Supra* ¶ 20 (citing *Witherell v. Weimer*, 85 Ill. 2d 146, 156 (1981)). Accordingly, plaintiffs' complaint against the Deutsche defendants, filed in 2009, was outside the five-year limitations period and was properly dismissed by the trial court.

¶ 92    The majority faithfully sets forth our discovery rule, but fails to apply it in any meaningful fashion in this case. Instead, the majority applies a variation of the rule adopted by the California Supreme Court to determine "when *actual injury*, caused by an accountant's negligent filing of tax returns, occurs," so as to commence the running of the statute of limitations period under California's Code of Civil Procedure. (Emphasis in original.) *International Engine Parts, Inc. v. Feddersen & Co.*, 888 P.2d 1279, 1280 (Cal. 1995). Under the California rule, "actual injury" (which is a legal term of art under California law (*id.* at 1287)), occurs, and the limitations period begins to run, on the date of the IRS deficiency tax assessment or finality of the IRS audit process, even if the accountant's negligence may have been discovered earlier during the audit (*id.* at 1287, 1288). The California high court observed that the rule "both conserves judicial resources and avoids forcing the client to sue the allegedly negligent accountant for malpractice while the audit is pending. It also avoids requiring the client to allege facts in the negligence action that could be used against him or her in the audit, without first allowing the accountant to correct the error (or mitigate the consequences thereof) during the audit process." *Id.* at 1287.

¶ 93    Based on *Feddersen*, the majority holds that the limitations period in this case commenced when the IRS issued a notice of deficiency to plaintiffs in 2008. *Supra* ¶ 45. The policy concerns underlying the holding in *Feddersen*, however, are not implicated in this case. Simply stated, the Deutsche defendants were not plaintiffs' accountants, they did not prepare plaintiffs' tax returns, and they could not have mitigated the tax consequences of their earlier alleged fraud. The majority discounts these differences and justifies its holding by focusing on the "nature of the harm" defendants' conduct allegedly caused. *Supra* ¶ 34. Although acknowledging that plaintiffs' alleged injuries included the payment of significant fees to Deutsche Bank in 1999 and 2000 (*supra* ¶¶ 26, 34), the majority disregards that injury when considering the "nature of the harm." Instead, the majority turns to what it concludes is the "major benefit" plaintiffs sought in their transactions with the Deutsche defendants: the ability to deduct their losses on their income tax returns. *Supra* ¶ 34. Presumably, the alleged inability to enjoy this "major benefit" constitutes the major harm or the major injury to plaintiffs. The majority thus pegs this case as a tax-liability case, bringing it a step closer to a *Feddersen*-type scenario. But the majority's approach is contrary to our discovery rule and contrary to plaintiffs' complaint.

¶ 94    Our discovery rule only delays commencement of the limitations period until the plaintiff knows, or reasonably should know, of some injury and that it was wrongfully caused. Our discovery rule does *not* delay commencement of the limitations period until the plaintiff knows of some unfulfilled "major benefit" resulting in a major injury. See *Golla*, 167 Ill. 2d at 363-64. As set forth above, plaintiffs alleged in their complaint numerous injuries, in

-28-

addition to an increase in their tax liability. Plaintiffs alleged injury in the payment of significant fees to defendants; the costs associated with implementing the investment strategies; the lost opportunity to invest in legitimate tax-savings strategies; and the lost opportunity to mitigate their losses by participating in the IRS amnesty program. This court should not rewrite plaintiffs' complaint, and our discovery rule, by tying the limitations period to the injury it regards as the "major" one.

¶ 95    For these reasons, I dissent from part I of the majority opinion which affirms the appellate court judgment as to the timeliness of plaintiffs' complaint against the Deutsche defendants, and would affirm the trial court's dismissal of plaintiffs' claims against these defendants. Accordingly, I do not join in parts II and III of the majority opinion because dismissal would moot any other issues as to plaintiffs' claims for breach of fiduciary duty (part II) and negligent misrepresentation (part III). In all other respects, I concur in the majority opinion.

¶ 96    CHIEF JUSTICE KILBRIDE joins in this partial concurrence and partial dissent.